J-S26043-15

2015 PA Super 228

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| LAWRENCE A. SEMENZA | |
| Appellant | No. 531 MDA 2014 |

Appeal from the Judgment of Sentence January 27, 2014
In the Court of Common Pleas of Lackawanna County
Criminal Division at No(s): CP-35-CR-0001203-2012

BEFORE:  OTT, J., WECHT, J., and JENKINS, J.

OPINION BY JENKINS, J.:                    **FILED NOVEMBER 02, 2015**

Lawrence Semenza, captain of the Old Forge Fire Department and chief of the Old Forge Police Department, was accused of committing various sexual offenses against a minor, N.B., a volunteer firefighter, in 2004-05. A jury found Semenza guilty of corruption of minors[1] and failure to report suspected child abuse[2] but acquitted him of unlawful contact with a minor,[3] indecent exposure[4] and indecent assault.[5]    The trial court sentenced

_____

[1] 18 Pa.C.S. § 6301.

[2] 23 Pa.C.S. § 6311.

[3] 18 Pa.C.S. § 6318.

[4] 18 Pa.C.S. § 3127.

[5] 18 Pa.C.S. § 3125.

1

Semenza to an aggregate of 1½ - 4 years' imprisonment. Semenza filed timely post-sentence motions, which the court denied, and a timely notice of appeal. Both Semenza and the trial court complied with Pa.R.A.P. 1925.

The first issue in this appeal is whether the trial court abused its discretion in admitting evidence under Pa.R.E. 404(b) of Semenza's sexual relationship with an adult female, M.K.S.,[6] in 2007-08, subsequent to Semenza's alleged crimes against N.B. The trial court held that this evidence was admissible under Rule 404(b)(2) to demonstrate the existence of a common scheme or plan. We disagree, and we reverse Semenza's judgment of sentence and remand for a new trial.

Semenza raises the following four issues on appeal:

1. Did the trial court err and abuse its discretion in allowing [S.] to testify to matters involving prior wrongs or bad acts which neither fell within an exception under Pa.R.E. 404(b) and, alternatively, were irrelevant and unduly and unfairly prejudicial to the Defendant's right to a fair trial?

2. Did the trial court err and abuse its discretion in refusing to give the jury instruction on corruption of minors as requested by the defense and in failing, over the objection of the defense, to provide the Pennsylvania Standard Criminal Jury Instruction on corruption of minors?

3. Did the trial court abuse its discretion and/or err as a matter of law in concluding that 18 Pa.C.S.A. § 6301(a)(1) is a sexual offense or similar to § 6301(a)(1)(ii) thereby requiring registration pursuant to 42 Pa.C.S.A. §§ 9799.13(1) &

_____

[6] As discussed below, it seems clear from the record that M.K.S. was not a minor at the time she met Semenza. Nevertheless, to protect her dignity, we will refer to her by her initials.

9799.14 and in directing that [Semenza] register as a sex offender for a period of 15 years?

4. Did the trial court abuse its discretion and impose a manifestly excessive sentence which fell outside the Pennsylvania Sentencing Guidelines in assigning an offense gravity score of '5' rather than a '4' to the corruption of minors conviction, where the alleged conduct occurred between 2004-2007 and it could not be concluded from the verdict that the offense was one of a 'sexual nature'?

Brief For Appellant, at 6.

In his first argument, Semenza challenges the trial court's decision to admit evidence of his sexual relationship with M.K.S. under the common scheme exception to Rule 404(b)(2). The admissibility of evidence is within the sound discretion of the trial court, and we will not disturb an evidentiary ruling absent an abuse of that discretion. ***Commonwealth v. Flor***, 998 A.2d 606, 623 (Pa.2010). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." ***Commonwealth v. Harris***, 884 A.2d 920, 924 (Pa.Super.2005).

The following evidence is pertinent to the common scheme issue. In 2004, Semenza was 40 years old, and he was both captain of the Old Forge Fire Department and a sergeant in the Old Forge Police Department. N.T., 10/16/13, at 62, 118. In 2005, he became chief of the Police Department. N.T., 10/21/13, at 201.

N.B. testified that in 2004, when she was 15 years old and a sophomore in high school, she wanted to become a member of the fire department, because she had grown up around firefighters. N.T. 10/16/13, pp. 53, 57. She applied to become a firefighter at the Old Forge firehouse. Semenza approved her application, making her the only female junior firefighter in the house. She began the Essentials training program that summer and completed it in the fall of 2004. *Id*. at 58-61. Semenza, her boss, was very supportive and accepting, and she saw him on a daily basis. *Id*. at 62, 63. She considered the firehouse a second home. *Id*. at 170.

N.B. testified that upon joining the fire department, she received old firefighter gear but was then immediately fitted for better fitting gear, a development she attributed to her relationship with Semenza. N.T., 10/16/13, at 66-70. Other evidence indicates, however, that she did not receive the new gear until one year after joining the fire department, and that 8 of the 12-15 members of the firehouse received new gear at the same time as she. N.T., 10/21/13, at 119-21. This equipment was paid for by the fire company. N.T., 10/16/13, at 70.

N.B. testified that her first intimate physical contact with Semenza occurred in the kitchen of the firehouse, where he touched and kissed her. N.T., 10/16/13, at 73. N.B. did not identify the date of this incident. Furthermore, in February 2005, after N.B. fought her first large fire, Semenza watched her take a shower in the firehouse bathroom. *Id*. at 82-

N.B. also stated that she and Semenza kissed on multiple occasions, and that Semenza "grabbed [her] butt" in front of people and ground his body into her back. *Id*. at 117. Other witnesses observed displays of affection between Semenza and N.B. *See* pages 6-7, *infra*.

N.B. accused Semenza of digitally penetrating her vagina on two occasions. Once, in early 2005, while N.B. sat under a blanket with Semenza on the couch in the television room of the firehouse, Semenza placed his hand within her underwear and digitally penetrated her. N.T., 10/16/13, at 108-09, 111, 112. On another occasion close in time to the incident on the couch, Semenza digitally penetrated her in the firehouse weight room. *Id*. at 116. These were the only times that Semenza touched her vaginally, and he never touched her in that manner after her sixteenth birthday in March 2006. *Id*. at 117, 191, 197. Semenza never had vaginal intercourse or oral sex with N.B. *Id*. at 178, 196.

N.B. added that on another unspecified date, Semenza exposed himself to her in the firehouse kitchen and asked her to touch his penis. N.T., 10/16/13, at 117.

N.B. stated that she went to multiple training events with Semenza and other members of the department. N.T., 10/16/13, at 91. At most events, Semenza was an instructor. *Id*. On one trip, they had "intimate kissing" in his room, but nothing else happened. *Id*. at 94-95.

N.B. testified that she wanted a romantic relationship with Semenza and believed that she was almost like his wife. N.T., 10/16/13, at 214. As part of their relationship, Semenza gave N.B. presents, such as a Claddagh ring (a traditional Irish ring) and a Maltese Cross. N.T., 10/16/13, at 98, 100. These gifts, however, coincided with other members of the fire department exchanging Christmas gifts. *Id.* at 97, 100-102, 174.

N.B. testified that her romantic relationship with Semenza started to wane during her senior year in high school and ended by the end of 2006 or beginning of 2007. N.T., 10/16/13, at 144-145, 244. According to N.B., she became "very busy" with "[her] senior project and senior activities," and Semenza was busy as well, so their relationship "kind of just faded away." *Id*. at 148.

The testimony of other Commonwealth witnesses suggests that Semenza's relationship with N.B. had a sexual dimension. Kim Zupon, Semenza's ex-wife, and Michael Zupon, Kim's present husband, testified that in the spring of 2004 or 2005,[7] they observed Semenza with N.B. in a lingerie department in Wal-Mart. N.T., 10/17/13, at 160-62, 180-82.

_____

[7] Kim Zupon testified that she could not remember which year the incident took place, but she recalled that the event took place during the spring when her daughter was fifteen years old. N.T., 10/17/13, at 161-62. Her daughter was born on May 16, 1989. *Id*. at 162. Thus, her testimony indicates that the incident took place in the mid-to-late spring of 2004 or the early spring of 2005.

Semenza was holding thong underwear against N.B. and commenting about how thong underwear would look sexy on her. N.T., 10/17/13, at 180-82. Alysha Englert testified that in the fall of 2004, she observed Semenza kissing N.B. romantically in the firehouse kitchen. N.T., 10/17/13, at 147-49. Tammy Eastwood testified that she observed Semenza kissing N.B. on the street outside of the police department. The kiss "started off as a slow, passionate kiss, hands going up and down, again, above the clothes, below the clothes."[8] N.T., 10/18/13 at 214. Walter Chiavicci, another firefighter, testified that he in the fall of 2004, observed Semenza and N.B. in the firehouse kitchen with his hand up her skirt. N.T., 10/17/13, at 267, 280. Steve Lowe, a former policeman, testified that on Halloween evening in 2004 (October 31, 2004), he observed Semenza and N.B. close together on the couch in the firehouse with a blanket covering them. *Id*. at 288-89. Lowe also testified that he heard Semenza tell N.B. that he wanted to take her next door and have sex with her, using the "f---" expletive. *Id*. at 291-92.

Over Semenza's objection, the trial court permitted the Commonwealth to present M.K.S.'s testimony as "common scheme"

_____

[8] Eastwood gave conflicting testimony about the time that this event took place. She stated in an interview with a police detective that this incident took place in 2007, after N.B. turned 18 years old, but claimed during trial that it took place in 2005. N.T., 10/18/13, at 220. If this event took place after N.B. turned 18, it could not constitute corruption of minors. *See* 18 Pa.C.S. § 6301(a)(1) (requiring proof that defendant "corrupt[] or tend[] to corrupt the morals of any minor less than 18 years of age").

evidence under Rule 404(b). M.K.S. testified that she met Semenza in January 2007. N.T., 10/18/13, at 30. Before meeting Semenza, M.K.S. joined the military at age 17,[9] went through basic and advanced individual training, came home for two weeks, was deployed to Iraq, and returned to the United States in 2006. N.T., 10/18/13, at 25. In January 2007, the same month she met Semenza, she graduated from the Police Academy at Lackawanna College.[10] *Id*. at 25-26. The record does not explicitly disclose M.K.S.'s age, but it is unlikely that she accomplished all of these milestones before the age of eighteen. Thus, we find it all but certain that she was at least eighteen, and no longer a minor, at the time she met Semenza.

After M.K.S. met Semenza through mutual friends, she applied for a position with the Old Forge Police Department. N.T., 10/18/13, at 26. M.K.S. interviewed for a conditional position and received Semenza's support for hiring. *Id*. at 28-29. She was hired on a conditional basis. *Id*. at 28.

Also in January 2007, M.K.S. had to travel to Harrisburg to take the Municipal Police Officers Training Education Commission ("MPOTEC") test, and Semenza offered to take her. *Id***.** at 30, 37. When they arrived in

---

[9] We take judicial notice that an individual must reach age seventeen before entering the United States military. 10 U.S.C. § 505.

[10] M.K.S. added that on unspecified dates, she "continued [her] degree" at the University of Scranton and graduated with degrees in criminal justice and psychology. N.T., 10/18/13, at 25. It is unclear from this testimony when she started or finished college.

Harrisburg, M.K.S. discovered that Semenza had obtained one room with two beds. *Id*. at 30. That night, they slept in the same bed and had sexual intercourse. *Id*. at 30-31. She testified that she felt trapped but had no other choice than to stay with Semenza and drive home with him the following day. *Id*. In her words, she passed her training test with "flying colors". *Id*. at 31.

M.K.S. recalled one other sexual incident in the fall of 2008, over one year later. N.T., 10/18/13, at 32, 37. Semenza called her to meet for coffee. Semenza picked her up, drove her to a dark road, where they had sexual intercourse in the back of his vehicle. *Id*. at 32. Over this 1.5 year time frame, M.K.S. believed that Semenza gave praise for her work and privileges in the form of shift scheduling because they had sex. *Id*. at 32. But after the second sexual liaison, she began to distance herself from Semenza because she was in a committed relationship with another person. *Id*. at 34-35. He became angry, and her shifts declined. *Id*. at 33. The evidence reflects, however, that her shifts might have declined for other reasons. First, she contracted cervical cancer which required medical treatment. *Id*. She also informed Semenza that she planned to seek employment with the Scranton Police Department, and Semenza explained to her that he had to work other officers into the schedule because she was leaving. *Id*. at 35.

Semenza testified in his own defense. He denied penetrating N.B. digitally as well as having indecent contact with her, exposing himself to her, or kissing her. N.T., 10/21/13, at 280-81. He also denied the Zupons' testimony that he shopped for lingerie with N.B. and the testimony of other Commonwealth witnesses that he kissed N.B. romantically or groped her in a sexual manner. *Id*. at 259-64. He admitted, however, that he had a sexual relationship with M.K.S. *Id*. at 209.

Relevance is the threshold for admissibility of evidence. ***Commonwealth v. Cook***, 952 A.2d 594, 612 (Pa.2008). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." ***Commonwealth v. Drumheller***, 808 A.2d 893, 904 (Pa.2002). "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. In addition, "the court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Pa.R.E. 404(b)(1). "Such evidence may be admissible for another purpose," however, "such as proving the existence of a common scheme, establishing an individual's motive, intent, or plan, or identifying a criminal defendant as the perpetrator of the offense charged." Pa.R.E. 404(b)(2).

When ruling upon the admissibility of evidence under the common scheme exception,

> the trial court must first examine the details and surrounding circumstances of each criminal incident[11] to assure that the evidence reveals criminal conduct *which is distinctive and so nearly identical as to become the signature of the same perpetrator. Relevant to such a finding will be the habits or patterns of action or conduct undertaken by the perpetrator to commit crime, as well as the time, place, and types of victims typically chosen by the perpetrator.* Given this initial determination, the court is bound to engage in a careful balancing test to assure that the common plan evidence is not too remote in time to be probative. If the evidence reveals that the details of each criminal incident are nearly identical, the fact

---

[11] Semenza's first act of sexual intercourse with M.K.S. during their trip to Harrisburg in January 2007 possibly was non-consensual and thus criminal, because M.K.S. might have felt trapped into sharing the hotel room with Semenza and having intercourse with him. It appears, however, that M.K.S. consented to sexual intercourse with Semenza on the second occasion in 2008.

It is an interesting question whether uncharged misconduct must itself be criminal in order to be admissible as common scheme evidence under Rule 404(b). Semenza, however, does not contend that his sexual relationship with M.K.S. falls outside the bounds of common scheme evidence on the ground that it was non-criminal. Because Semenza does not raise this argument, we will not explore it further.

that the incidents are separated by a lapse of time will not likely prevent the offer of the evidence unless the time lapse is excessive. Finally, the trial court must assure that the probative value of the evidence is not outweighed by its potential prejudicial impact upon the trier of fact. To do so, the court must balance the potential prejudicial impact of the evidence with such factors as the degree of similarity established between the incidents of criminal conduct, the Commonwealth's need to present evidence under the common plan exception, and the ability of the trial court to caution the jury concerning the proper use of such evidence by them in their deliberations.

*Commonwealth v. Tyson*, -- A.3d --, 2015 WL 3609355, *3 (Pa.Super., June 10, 2015) (en banc) (emphasis added). To clarify the definition of "signature crimes," our Supreme Court

has often cited McCormick, Evidence, § 190 (1972 2d ed.), wherein evidence of other crimes is said to be admissible [to] 'prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused. Here much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or theft. The device used must be so unusual and distinctive as to be like a signature.'

*Commonwealth v. Roney*, 79 A.3d 595, 606 (Pa.2013). In short, common scheme evidence is admissible "where the crimes are so related that proof of one tends to prove the others." *Commonwealth v. Elliott*, 700 A.2d 1243, 1249 (Pa.1997) (where defendant was accused of sexually assaulting and killing young woman he approached outside a particular club at 4:30 a.m., evidence that defendant similarly preyed upon three other young women as each of them left same club in early morning hours and then physically and/or sexually assaulted them was admissible under common scheme exception).

Review of multiple decisions from our Supreme Court and this Court convinces us that evidence of Semenza's affair with M.K.S. is inadmissible under the common scheme exception to Rule 404(b).  *See Roney*, *supra*; *Commonwealth v. Bryant*, 530 A.2d 83 (Pa.1987) ("*Bryant I*"); *Commonwealth v. Bryant*, 611 A.2d 703 (Pa.1992) ("*Bryant II*"); *Commonwealth v. Ross*, 57 A.3d 85 (Pa.Super.2012) (en banc).

In *Roney*, the defendant was convicted of first degree murder and sentenced to death for shooting and killing a police officer in the course of a robbery at a PNC Bank.  During post-conviction proceedings, the defendant argued that trial counsel was ineffective for failing to investigate and present evidence suggesting that one Travis Hall participated in the bank robbery and was the individual who shot the officer.  To support this claim, the defendant averred that Hall (1) committed numerous armed robberies, some involving financial establishments, within the same time frame and within a similar geographical area as the PNC Bank robbery; (2) fired his gun during some of the robberies; (3) received aid from accomplices during the robberies; and (4) stole get-away vehicles for use in the robberies.  Our Supreme Court held that the PCRA court properly found this evidence inadmissible under the common scheme exception:

> [T]he PCRA court held that evidence of Hall's other robberies did not come close to meeting the standard for admissibility as a common scheme, plan, or design ... [T]he PCRA court determined that none of Hall's robberies had occurred at a bank; rather, his robberies had involved various entities, including a check cashing store, a restaurant, and armored trucks; that Hall

had never killed anyone in the course of his robberies; and that the robberies had been in the Philadelphia area generally, not in a specific area of the city ... The PCRA court concluded that Hall's robberies exhibited 'no unique facts' that would 'amount to a signature or [would] earmark the crimes as 'the handiwork' of Hall." ... Rather, the PCRA court concluded, '[t]he robberies committed by Mr. Hall, sadly but realistically, reflect the type of violent crimes involving stolen vehicles, disguises, and firearms that occur so prevalently in modern day America.'

The PCRA court's determinations and conclusions summarized above are all supported by the record and free of legal error.

*Id*., 79 A.3d at 606.

**Bryant I** and **Bryant II** involved the same defendant. At his first trial (**Bryant I**), the defendant was convicted of first degree murder and sentenced to death for beating an elderly woman, Edith Steckle, to death in her Philadelphia home during a burglary. Steckle never regained consciousness after the beating, and there were no eyewitnesses to the incident or physical evidence recovered from the crime scene that incriminated the defendant. Several weeks after the crime, however, the police found items belonging to Steckle (a television, radio and ring) in the defendant's residence. During trial, the Commonwealth introduced evidence of a robbery committed by the defendant two months before the crime in question at a residence four blocks away in which the defendant severely beat an elderly woman, stole items from her house and defecated on her floor. Our Supreme Court held that evidence of the other robbery was not admissible as common scheme evidence:

Granted, both of the crimes in question involved burglaries and physical assaults, but more is required than the mere repeated

- 14 -

commission of the same general class of crime... There may be some similarities to be perceived between the crimes, but those similarities are confined to relatively insignificant details that would likely be common elements regardless of who had committed the crimes. For example, both crimes occurred in the middle of the night, and both were perpetrated by individuals wearing dark jackets. It is, however, common for burglaries to occur at night, and it is certainly not unusual for persons to be seen wearing dark jackets. Similarly, both of the burglaries in question involved the ransacking of houses. Yet, in connection with domestic burglaries, it is most common that burglars are looking for goods to steal. A television, a radio, and a ring were stolen from the home of the present victim, but the record is silent as to what items, if any, were stolen in the course of the earlier crime. Nor can much significance be ascribed to the fact that the victims of both crimes were senior citizens living in the Germantown section of the City of Philadelphia. Senior citizens are frequently the victims of violent crimes, and this is particularly so in major urban areas such as the City of Philadelphia.

A number of differences between the two crimes could also be noted, such as the fact that the perpetrator of the earlier crime defecated on the floor in the victim's house whereas nothing comparable occurred in connection with the instant crime, but, inasmuch as features which the two crimes had in common were lacking, it is not necessary to further address such differences. It is clear that the circumstances surrounding the two crimes were not sufficiently similar as to render admissible the evidence of appellant's role in the crime for which he was not presently being tried.

*Id*., 530 A.2d at 86. The improper admission of evidence of the other robbery mandated a new trial. *Id*. at 86.

During the defendant's second trial (**Bryant II**), the Commonwealth introduced into evidence details of yet another crime that the defendant committed in 1988, ten years after the assault against Steckle. In the 1988 offense, the defendant broke into a house on his street in which a pregnant

23-year-old black female, Valerie Phillips, lived with her young son. The defendant beat Phillips on the head with his fists, dragged her upstairs to her bedroom, told her to lie on her stomach and fondled her vagina. Phillips screamed that she might deliver her baby since she was eight months pregnant. The defendant stopped his assault, took thirty dollars in cash and left the premises. The Commonwealth offered this evidence to persuade the jury that the man that attacked Phillips was the same man who killed the elderly female in the 1978 robbery. The jury convicted the defendant of first degree murder, but the Supreme Court again reversed on the ground that the crime against Phillips was inadmissible under a common scheme theory:

> [W]e cannot conclude that the factual predicates are so distinctly similar that one could naturally conclude that both crimes were perpetrated by the same individual. Although there exist[] general similarities, the elements of common scheme or design are lacking. It is true that both crimes occurred at approximately the same time of night and within a one and one-half block of the Appellant's home. However, the victims' ages varied drastically, in addition to the victims being of different races. Furthermore, the evidence was questionable as to whether [] Steckle was sexually assaulted although [] Phillips was assaulted. It was also widely known that [] Steckle lived alone while [] Phillips lived with her three-year-old son. Furthermore, while [] Steckle was brutally and viciously injured in the face, head, body, arms and legs, [] Phillips was punched only in the head. [] Steckle was found lying on the ground floor, while [] Phillips was dragged to the second-floor bedroom. Finally, a television, radio, and ring were taken from [] Steckle's home, while only thirty dollars in cash was taken from [] Phillips even though a portable television and radio were in full sight of the burglar.
>
> While it is true that every element of the crimes need not be identical to constitute a 'signature crime', the details relied upon must be sufficiently unique to suggest that the crimes were

committed by the same person. Based upon the similarities and differences between these two crimes and the lack of any uniqueness, we would be hard pressed to conclude that the same individual committed both crimes.

**Bryant II**, 611 A.2d at 706.

Finally, in **Ross**, this Court held, in the course of vacating the defendant's conviction for murdering his girlfriend, that the trial court abused its discretion by allowing the Commonwealth to introduce the testimony of three of Ross' former romantic partners regarding instances of domestic abuse as common scheme evidence:

> The testimony of [the three former partners] did not establish a pattern of conduct on Ross' part so distinctive that 'proof of one tends to prove the others.' ... Instead, the prior bad acts testimony demonstrated that Ross was a domestic abuser of women with whom he was involved in on-going romantic relationships, and did not show a unique 'signature' *modus operandi* relevant to Miller's murder. Indeed, the profound dissimilarity in the level of brutality inflicted on Miller, along with the bite on her breast and the extensive use of duct tape to bind her, have no parallel to the incidents of domestic abuse described by [the three former partners] and weigh strongly against any inference that proof of his domestic abuse tended to prove he murdered Miller ... [T]he testimony of [the three former partners] was used to establish that Ross was an abusive man who in the past was physically and sexually abusive to his romantic partners so that the improper inference could be drawn that he was capable of, and had the propensity for, committing the types of grotesque acts of physical and sexual abuse inflicted upon Miller resulting in her death.

*Id*. at 104-05.

These decisions demonstrate that uncharged conduct is not admissible to prove a common scheme except when it shares unique features with the charged offenses that reflect the defendant's "signature". General

similarities or insignificant similarities are insufficient; "more is required than the mere repeated commission of the same general class of crime." ***Bryant I***, 530 A.2d at 86.

Certain general similarities exist between Semenza's relationships with N.B. and with M.K.S.: Semenza was substantially older than both females, hired both females after interviewing them, and was their superior in the workplace. These similarities, however, are not sufficiently unique to constitute Semenza's "signature". To the contrary, these facts are commonplace in many, and perhaps most, sexual harassment cases that arise in the workplace.

The differences between Semenza's relationships with N.B. and M.K.S. are more pronounced than their similarities. When M.K.S. met Semenza, it is virtually certain that she was no longer a minor, because she had served in the military and had graduated the Police Academy; N.B., on the other hand, was only 15 years old and a high school sophomore when she met Semenza. The nature of Semenza's sexual contact with M.K.S. differed from his alleged sexual contact with N.B. Whereas Semenza had vaginal intercourse with M.K.S. twice, N.B. claimed that Semenza digitally penetrated her twice, had her touch his penis once, and kissed and fondled her on other occasions. Semenza had sex with M.K.S. outside of her place of employment, in a hotel or in an automobile; N.B. claimed that Semenza digitally penetrated her and had her touch his penis in the firehouse. N.B.

alleged that Semenza watched her take a shower in the firehouse; Semenza never watched M.K.S. shower. N.B. wanted a romantic relationship with Semenza; M.K.S. did not. Semenza gave gifts to N.B. such as a Claddagh ring and Maltese Cross; he did not give similar gifts to M.K.S. M.K.S. accused Semenza of withdrawing scheduling privileges when their physical relationship ended; N.B. did not accuse Semenza of withdrawing any privileges when their relationship faded away.

In its attempt to rebut Semenza's Rule 404(b) argument, the Commonwealth exaggerates the similarities between Semenza's relationship with N.B. and his relationship with M.K.S. For example, the Commonwealth claims as a similarity that both N.B. and M.K.S. are young Caucasian females. This overlooks that N.B. was only fifteen when she met Semenza while M.K.S. was almost certainly an adult and clearly more mature than N.B. in terms of experience, having served in the military and graduated the Police Academy. Furthermore, the overwhelming majority of Old Forge's population is Caucasian,[12] so as a statistical matter, all persons with whom Semenza interacted were virtually certain to be Caucasian. The Commonwealth also claims that both women spent more time at work than

---

[12] We take judicial notice that the 2010 census shows that the population in Old Forge is 96.9% Caucasian. *Cf. Wings Field Preservation Associates, L.P. v. Com., Dept. of Trans.*, 776 A.2d 311, 318 n. 14 (Pa.Cmwlth.2001) (taking judicial notice of population of 1998 census estimate of Bucks County's population).

was necessary for their positions. This suggests a pattern of the females, not of Semenza's. The Commonwealth also asserts that Semenza's contact with the females centered around the workplace or work-related activities. This is both inaccurate and vague – inaccurate because M.K.S.' second sexual incident with Semenza took place in a car on a deserted road instead of in or near the workplace, vague because "work-related activities" includes too broad a range of subjects to be helpful in determining whether Semenza's conduct had a signature. Next, the Commonwealth contends that both women testified that Semenza was responsible for upgrades in equipment. We cannot find any testimony of M.K.S. to this effect. Finally, the Commonwealth claims that there was an overlap in time between Semenza's relationships with N.B. and M.K.S. We see no overlap: Semenza's alleged sexual contact with N.B. ended in March 2006, almost one year before his sexual contact with M.K.S.

Because many of the alleged similarities between Semenza's treatment of N.B. and M.K.S. are either generic or exaggerated, and because there are many dissimilarities in Semenza's treatment of these individuals, we conclude that the evidence of Semenza's relationship with M.K.S. is inadmissible under the common scheme exception to Rule 404(b). We also conclude that this evidence prejudiced Semenza's defense. The Commonwealth highlighted this evidence in its closing argument, stating:

> I submit to you that as much as [Semenza] and defense counsel want[] to hide from [M.K.S.] that *[M.K.S.'s] testimony could not have been more crucial to this trial*. Second Lieutenant [M.K.S.] took that stand and told you what I submit to you is her worst nightmare, a combat veteran that had to admit to 14 strangers that she let herself be put in a position with that man that she trusted [and] that she felt trapped. He helped her get the job, he was going to be her boss, he drove her there, the night before the test that she would need to pass in order to get the job. It was only a conditional offer of employment … [M.K.S.] told you that. If she doesn't pass that test[,] it's a no go. That's the night … that this defendant used his position to have sex with her.[13] And the relationship continued.

N.T., 10/22/13, at 141 (emphasis added). The Commonwealth continued that Semenza's conduct toward M.K.S. constituted an abuse of trust: "Doing the right thing for someone else for your own selfish gain[,] it's not doing the right thing, it's abusing your trust. It's abusing the position. It's abusing the trust that people have in you." *Id*. at 142. Concededly, (1) the trial court gave a limiting instruction cautioning the jury to use evidence about M.K.S. solely to determine whether a common scheme existed between the charges and Semenza's conduct towards M.K.S.; (2) the jury acquitted Semenza on three of the five charges, and (3) the Commonwealth presented evidence from witnesses other than M.K.S. -- albeit not overwhelming evidence -- that supported Semenza's conviction for

---

[13] In addition to highlighting this evidence, the Commonwealth might also have distorted it. The Commonwealth seemed to suggest that Semenza had some control over whether M.K.S. passed or failed the MPOTEC test. The record does not indicate, however, whether the MPOTEC test had subjective components whose outcome Semenza could influence, or whether it was a standardized objective test beyond Semenza's control.

corruption of minors. Nevertheless, M.K.S.'s testimony, combined with the Commonwealth's closing argument that M.K.S.'s testimony "could not have been more crucial to this trial," might well have spelled the difference between the mixed verdict that the jury returned and acquittal on all counts. *See Commonwealth v. Walter*, 849 A.2d 265, 268-70 (Pa.Super.2004) (new trial required in prosecution for first degree murder of infant due to improper admission of prior bad acts evidence that infant had prior injury to his leg caused by twisting of limb, together with prosecutor's closing argument referring to that evidence and stating that infant had fractures that were consistent with how defendant said he carried infant; defendant could not be linked to infant's prior injury, and prosecutor's argument clearly and improperly suggested that defendant was responsible for prior injury).

In light of our remand for a new trial, we need not address Semenza's objections to his sentence in his third and fourth issues on appeal. On the other hand, we will address Semenza's second issue on appeal, a challenge to the jury instruction defining corruption of minors, so that it does not arise again on remand. *See Drum v. Shaull Equipment & Supply Co.*, 787 A.2d 1050, 1059 (Pa.Super.2001) ("other issues remain which were raised by Appellants on appeal, have been briefed adequately, and are likely to recur on remand. For the guidance of the parties and the trial court, therefore, we will address these issues").

During trial, and in this appeal, Semenza objected to the following portion of the jury instruction that the trial court gave concerning corruption of minors:

> It is not necessary for the Commonwealth to prove that a minor's morals were actually corrupted or changed in any way. It is sufficient that you find beyond a reasonable doubt *that the defendant's acts tended to corrupt the morals of a minor. The Courts of Pennsylvania have held that actions that tend to corrupt the morals of a minor are those that would offend the common sense of the community and the sense of decency, propriety and morality which most people entertain.*

N.T., 10/22/14, at 172-173 (emphasis added). According to Semenza, the corruption of minors instruction should have told the jury to examine whether any "sexual contact" corrupted or tended to corrupt the morals of a minor, not whether any "act" corrupted or tended to corrupt the minor's morals. Use of "act", Semenza insisted, improperly expanded what conduct the jury could consider and invited them to apply its own arbitrary standards in its deliberations. Consequently, said Semenza, the trial court permitted the jury to find him guilty for such innocuous acts as spending a lot of time with N.B. at the firehouse or purchasing gifts for her.

When evaluating the propriety of jury instructions,

> this Court will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper. We further note that, it is an unquestionable maxim of law in this Commonwealth that a trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error.

*Commonwealth v. Antidormi*, 84 A.3d 736, 754 (Pa.Super.2014).

We conclude that the trial court accurately and adequately presented the law of corruption of minors in its jury instruction. Contrary to Semenza's strenuous argument, the corruption of minors statute explicitly requires the jury to examine the defendant's "acts". **See** 18 Pa.C.S. § 6301(a)(1)(i) ("whoever, being of the age of 18 years and upwards, by *any act* corrupts or tends to corrupt the morals of any minor less than 18 years of age ... commits a misdemeanor of the first degree") (emphasis added). "Any act" extends further than sexual misconduct. **See Commonwealth v. Meszaros**, 168 A.2d 781, 782 (Pa.Super.1961) ("'tending to corrupt,' like 'contributing to delinquency,' is a broad term involving conduct toward a child *in an unlimited variety of ways* which tends to produce or to encourage or to continue conduct of the child which would amount to delinquent conduct"). Conversely, section 6301 does not mention "sexual conduct", so it is questionable whether this term belongs in a jury instruction on corruption of minors.

Moreover, the final sentence of the passage in question, which defines "actions that tend to corrupt the morals of a minor" as "those that would offend the common sense of the community and the sense of decency, propriety and morality which most people entertain," is completely proper, for we have used this very language in multiple decisions to clarify the offense of corruption of minors. As we held last year:

- 24 -

in deciding what conduct can be said to corrupt the morals of a minor, the common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it.

*Commonwealth v. Slocum*, 86 A.3d 272, 277 (Pa.Super.2014) (quoting

*Commonwealth v. Pankraz*, 554 A.2d 974, 977 (Pa.Super.1989);

*Commonwealth v. Randall*, 133 A.2d 276, 280 (Pa.Super.1957)).

Based on Semenza's meritorious argument in his first issue on appeal, we reverse and remand for a new trial. We find no merit in Semenza's second argument on appeal. We do not address Semenza's third and fourth arguments due to our disposition of his first argument.

Judgment of sentence vacated. Case remanded for a new trial.[14] Jurisdiction relinquished.

_____

[14] On September 4, 2015, we issued an unpublished memorandum in this appeal. On October 13, 2015, we ordered the unpublished memorandum withdrawn, and we now replace it with the present opinion.