*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CF-0761

MICHAEL RICARDO SMALLWOOD, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2019-CF2-016100)

(Hon. Jason Park, Trial Judge)

(Submitted October 18, 2023     Decided March 28, 2024)

*Michael Madden* was on the brief for appellant.

*Matthew M. Graves*, United States Attorney, and *Chimnomnso N. Kalu*, *Chrisellen R. Kolb*, *Lauren Galloway*, and *Ryan Sellinger*, Assistant United States Attorneys, were on the brief, for appellee.

Before MCLEESE,[*] HOWARD, and SHANKER, *Associate Judges*.

HOWARD, *Associate Judge*: Appellant Michael Ricardo Smallwood was

convicted of gun possession and related charges following a domestic dispute at the

---

[*] Associate Judge AliKhan was originally assigned to this case. Following her appointment to the U.S. District Court for the District of Columbia, effective December 12, 2023, Judge McLeese has been assigned to take her place on the panel.

home he shared with the mother of his child and stepchildren. On appeal, Mr. Smallwood challenges the trial judge's admission of the testimony of the mother of his child, his child, and his stepchildren, who each testified about Mr. Smallwood's prior possession of a gun. Upon review of the record, we hold that the trial judge properly admitted the testimony of the mother of the children as "direct and substantial proof" of the crime charged. As for the children's testimony, we conclude that any error in the admission of their testimony was harmless. Accordingly, for the reasons that follow, we affirm.

## I.     Factual Background

### A.     The Arrest

In August 2019, approximately three to four months before the incident, Mr. Smallwood moved into an apartment with Ms. Dana Lockridge, the mother of one of Mr. Smallwood's children, E.L., and his two stepchildren, D.L. and A.L. During the early morning hours of December 21, 2019, the Metropolitan Police Department ("MPD") responded to a domestic dispute at the shared residence of Mr. Smallwood and Ms. Lockridge. What began as an argument concerning an unpaid insurance bill quickly escalated into violence, leading to Ms. Lockridge calling 911. According to the testimony of Ms. Lockridge and the three children, Mr. Smallwood choked Ms. Lockridge before preventing her and the children from leaving the apartment.

When MPD arrived, another argument erupted between Mr. Smallwood and Ms. Lockridge. Ms. Lockridge offered to "show [officers] what else is in here," and escorted an officer to their shared bedroom. In the bedroom, Ms. Lockridge opened a dresser drawer revealing a pistol, a standard magazine, an extended magazine, and ammunition. Ms. Lockridge told officers that the gun, accompanying magazines, and ammunition belonged to Mr. Smallwood. The dresser drawer where the gun was recovered was utilized primarily by Mr. Smallwood and contained his clothing and personal items.

As a result, Mr. Smallwood was arrested and charged with several counts of kidnapping, assault, interfering with requests for assistance from law enforcement, cruelty towards a child, and unlawful possession of a firearm, ammunition, and a large capacity ammunition feeding device.

### B.    Contested Testimony and Mr. Smallwood's Objections

As relevant to this appeal, the government filed a pre-trial motion signaling its intent to introduce testimonial evidence of Mr. Smallwood's previous gun possession from Ms. Lockridge and each of the children—specifically, each would testify that, in the past, they had seen Mr. Smallwood with a gun in the apartment. Mr. Smallwood's counsel submitted a brief opposing the admission of the witnesses' testimony. At a pre-trial hearing, Mr. Smallwood's counsel objected to the

introduction of any testimony about Mr. Smallwood's prior crimes offered by the government's witnesses. The trial court reserved ruling on the admissibility of the witnesses' testimony until trial.

At trial, the government proffered that Ms. Lockridge would testify to seeing a gun in Mr. Smallwood's dresser drawer and asking him about the gun. Mr. Smallwood's counsel made two objections to the government's proffer. First, Mr. Smallwood's counsel argued that the testimony was inadmissibly vague because Ms. Lockridge would not provide the specific date or time when she allegedly saw the gun in the dresser drawer. In addition, Mr. Smallwood's counsel argued that the testimony was more prejudicial than probative and therefore should not be admitted at trial.

The trial judge disagreed. Citing this court's precedent,[1] the trial judge explained that evidence of prior possession of a weapon is admissible as "direct and substantial proof of the crime charged." The trial judge further explained that admission of such evidence requires consideration of the "temporal proximity of the incidents of prior possession to the charged offense and a comparison of the appearance of the weapon previously possessed by the defendant with that of the

---

[1] The trial judge was presumably referring to *Jones v. United States*, 127 A.3d 1173 (D.C. 2015), and *Williams v. United States*, 106 A.3d 1063 (D.C. 2015).

weapon actually used in the charged offense." Applying those standards to Ms. Lockridge's testimony, the trial judge found the testimony admissible. The trial judge reasoned that, despite her "fairly generic description of a black handgun," she would testify that only three months elapsed between the time she observed the gun in the dresser drawer and the incident leading to Mr. Smallwood's arrest, which made her testimony admissible as "direct and substantial proof" of the crime charged. Further, the trial judge noted that Ms. Lockridge had observed the gun in the very same place it was recovered, making her testimony highly probative.

When trial resumed, Ms. Lockridge testified that she saw the gun in the dresser drawer after Mr. Smallwood moved into the apartment in August 2019 and that the gun belonged to him. When asked whether she confronted Mr. Smallwood about the gun, Ms. Lockridge said she "may have mentioned it or asked him why it was there," but she could not recall what he said and stated nothing would help refresh her memory of his possible response. The government impeached Ms. Lockridge with her grand jury testimony, taken a few days after the incident, where she said Mr. Smallwood responded to her question about the gun with "some comment on the lines of the neighborhood where we live."

The next day, the trial court heard the government's proffer for each of the children's testimony individually and, in turn, gave Mr. Smallwood's counsel an

opportunity to object to their anticipated testimony. Mr. Smallwood's counsel did not object to the proffered testimony of any of the children.

The government proffered that D.L., the first stepchild to testify, would testify that he knew about the gun in the apartment and that he saw Mr. Smallwood walking through the apartment with a black gun before the arrest. Mr. Smallwood's counsel did not object to D.L.'s anticipated testimony. D.L. testified that he saw a black gun in the dresser drawer, but that he never saw Mr. Smallwood with a gun. The government offered D.L.'s grand jury testimony to refresh his recollection as to whether he ever saw Mr. Smallwood with a gun. After reviewing his grand jury testimony, D.L. testified that while he was playing video games he saw Mr. Smallwood walk past his bedroom toward his mother's room with a gun in hand. D.L. testified that he did not recall when he made this observation and that nothing would help refresh his memory about when he saw Mr. Smallwood with a gun. Using his grand jury testimony, the government impeached D.L. to establish that he saw Mr. Smallwood with a gun during the summer after Mr. Smallwood moved back into their apartment.

The second child to testify was E.L., the biological child of Mr. Smallwood. The government proffered that E.L. would testify that she saw Mr. Smallwood with a black gun in his hand while walking past a bedroom a few weeks or a month before

Mr. Smallwood was arrested. Again, Mr. Smallwood's counsel did not object to the proffer of E.L.'s testimony. When asked whether she previously saw Mr. Smallwood with a gun, E.L. testified that she thought she saw Mr. Smallwood with a gun, but said "[she's] not sure now." E.L. explained her confusion by stating that "when he was walking past, I thought I saw [a gun] because my brother said something . . . . But I don't think so." Nevertheless, E.L. went on to demonstrate how she saw Mr. Smallwood holding the gun in his hand as he walked through the hallway. To establish that E.L. in fact testified to having seen Mr. Smallwood with a gun, the government read E.L.'s grand jury testimony into the record. E.L. had told the grand jury that she saw Mr. Smallwood walk past the bedroom with a gun in hand.

Mr. Smallwood's counsel objected to the government refreshing E.L.'s recollection because when the government asked her whether she remembered testifying about seeing Mr. Smallwood with a gun in his hand, she said, "I remember reading it." Mr. Smallwood's counsel offered no additional explanation for the objection and the court quickly overruled the objection. When asked, E.L. affirmed that her memory was better when she testified before the grand jury than her memory at trial.

The final child to testify was A.L., Mr. Smallwood's stepchild. The government proffered that A.L. would testify that she saw a "[b]lack gun, short clip, and extended clip," saw the gun three times, and saw Mr. Smallwood give her godbrother the gun to hold. When asked whether there were any objections to A.L.'s proffered testimony, Mr. Smallwood's counsel did not object.

The government asked A.L. about seeing Mr. Smallwood with a gun, and she stated, "I think I did, maybe it was something else. Maybe it was a phone or something." She further testified that she thought she saw Mr. Smallwood with a gun "[c]oming to [their] house one night" and saw him with a gun once or twice. Mr. Smallwood's counsel objected, stating that the government "ought to . . . establish[] that [A.L.] actually [saw] him with a gun," referring to her earlier statement where she explained she thought she saw a gun. In response, the government impeached A.L. with her grand jury testimony where she testified that she saw Mr. Smallwood with a gun exactly three times and saw him with the gun in the apartment and getting it out of the dresser drawer. A.L. testified that the gun she saw was black, and the government refreshed her recollection with her grand jury testimony to establish that she saw "[a]n extended clip" with the gun. On cross-examination, Mr. Smallwood's counsel asked A.L. about the time she saw Mr. Smallwood let her godbrother hold a gun. A.L. said, "[m]aybe it was a phone or anything else. I'm not sure. That's just what I thought I saw."

During their testimony, each of the children admitted to lying to government investigators immediately after Mr. Smallwood was arrested. During his testimony, D.L. explained that he initially told investigators that he never saw Mr. Smallwood with a gun because he was "afraid of the truth coming out" and further extending "this entire process." During cross-examination, Mr. Smallwood's counsel confronted E.L. about telling investigators at the U.S. Attorney's Office that she never saw Mr. Smallwood with a gun. E.L. explained that she initially lied to investigators about not seeing Mr. Smallwood with a gun because "[she] didn't want anybody to get in trouble," but stated that "[her] brother and sister told [investigators about seeing the gun] so [she] figured . . . [that she] might as well tell them." Similar to her siblings, A.L. admitted to initially lying about never seeing Mr. Smallwood with a gun because "[she] got scared."

At the conclusion of trial, the jury found Mr. Smallwood guilty of Unlawful Possession of a Firearm (Prior Conviction) in violation of D.C. Code § 22-4503 (a)(1), Possession of Unregistered Firearm in violation of D.C. Code § 7-2502.01(a), Possession of a Large Capacity Ammunition Feeding Device in violation of D.C. Code § 7-2506.01(b), and Unlawful Possession of Ammunition in violation of D.C. Code § 7-2506.01(a)(3). On appeal, Mr. Smallwood primarily argues that the trial judge erred in admitting Ms. Lockridge's and each of the children's testimony regarding his prior gun possession, and that the admission was not harmless error.

## II.     Applicable Law & Standard of Review

"A trial judge has broad discretion to determine the admissibility of evidence of uncharged misconduct as direct and substantial proof of the crime charged under *Johnson*,[2] and on appeal our review of a judge's ruling admitting such evidence is limited to a consideration of whether there has been an abuse of discretion." *Jones v. United States*, 127 A.3d 1173, 1185 (D.C. 2015) (citing *Busey v. United States*, 747 A.2d 1153, 1165 (D.C. 2000)).   This court has described such review as "supervisory in nature and deferential in attitude." *Stone v. Alexander*, 6 A.3d 847, 851 (D.C. 2010) (internal quotation omitted).   Moreover, "[e]ven where we find error, 'we may find that the fact of error in the trial court's determination caused no significant prejudice and hold, therefore, that reversal is not required'" because the error was harmless. *Id.* (quoting *(James) Johnson v. United States*, 398 A.2d 354, 366 (D.C. 1979)).

## III.    Analysis

### A.     Admission of Ms. Lockridge's Testimony

"It is a principle of long standing in our law that evidence of one crime is inadmissible to prove *disposition* to commit crime, from which the jury may infer

---

[2] *(William) Johnson v. United States*, 683 A.2d 1087 (D.C. 1996) (en banc).

that the defendant committed the crime charged." *Drew v. United States*, 331 F.2d 85, 89 (D.C. Cir. 1964) (emphasis added). Notwithstanding this prohibition, other-crime evidence may be admitted when offered for a valid non-propensity purpose. *Id.* at 90. One such purpose is the use of evidence of other-crimes as "*direct proof of guilt*" for the crime charged. *Bellamy v. United States*, 296 A.3d 909, 917 (D.C. 2023) (citing *(William) Johnson v. United States*, 683 A.2d 1087, 1096 (D.C. 1996) (en banc) (emphasis in original)). In *(William) Johnson*, this court held other-crimes evidence is admissible "where such evidence: (1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context." 683 A.2d at 1098. However, *Johnson* evidence is subject to exclusion where "its probative value is substantially outweighed by [the danger of] unfair prejudice." *Bellamy*, 296 A.3d at 917 (internal quotation omitted).

In cases involving possession of a weapon, "[t]his court repeatedly has held 'that evidence of a defendant's prior possession of the weapon or type of weapon used to commit a charged offense can be admitted as direct and substantial proof of the crime charged.'" *(Carlos) Johnson v. United States*, 290 A.3d 500, 514 (D.C. 2023) (quoting *Jones*, 127 A.3d at 1184). In making such an admissibility determination, the trial court should consider "the temporal proximity of the incidents of prior possession to the charged offense and a comparison of the

appearance of the weapon previously possessed by the defendant with that of the weapon actually used in the charged offense." *Id.*

In the instant case, the trial judge explained that this court employs "something of a sliding scale" approach to admitting evidence of prior possession of a weapon. Under the approach, evidence that identifies a weapon more generically or involves a less distinctive weapon may be admitted where there is a shorter temporal proximity between the instance of prior possession and the crime charged. In *Coleman v. United States*, this court found no abuse of discretion where the trial court admitted a five-month old photograph of the appellant with a .45 caliber pistol, which was the same weapon used in the murders he was being charged for. 379 A.2d 710, 712 (D.C. 1977). Similarly, in *Jones*, this court upheld the trial court's admission of a witness's testimony that he observed the appellant with a gun on several occasions prior to the incident resulting in the appellant being charged with murder. *Jones*, 127 A.3d at 1183-84. Although the witness did not clarify whether those observations "occurred several months, or even a year, before the charged offense," this court found his testimony admissible "[g]iven the likelihood that the gun previously seen in appellant's possession was of the same distinctive type used in the charged offenses." *Id.* at 1186.

Applying that principle, the trial judge observed that Ms. Lockridge testified before the grand jury to first seeing a "black handgun" belonging to Mr. Smallwood in the top dresser drawer within three to four months of his arrest for possession of a handgun. When balancing this "fairly generic description" and the three-month time period between the incidents, the trial judge admitted Ms. Lockridge's testimony as "direct and substantial proof" of Mr. Smallwood's later-charged possession. In light of our precedent admitting evidence of prior possession of a weapon, we see no abuse of discretion in the trial judge's finding that the testimony is *Johnson* evidence.

Furthermore, our affirmance of the trial judge's admission of the evidence as *Johnson* evidence is aided by the trial judge's observation that Ms. Lockridge's testimony indicated that "it was the weapon that was kept in the drawer where the weapon that is the basis of the charged offense was kept." When considering *Johnson* evidence, this court has acknowledged that "the more likely it is that the weapon previously in the defendant's possession was the weapon used in the charged offense, the 'less relevant' is the length of time between the earlier sightings and the crime charged." *Jones*, 127 A.3d at 1185 (quoting *McConnaughey v. United States*, 804 A.2d 334, 339 (D.C. 2002)). Based on the proffer of Ms. Lockridge's testimony and her actual testimony at trial, the trial judge found that Ms. Lockridge observed a black gun in the same dresser drawer where officers recovered a black gun that

served as the basis of Mr. Smallwood's gun-possession charges. We find no abuse of discretion in the trial judge's finding taking notice of the likelihood that the black gun Ms. Lockridge testified to seeing in the dresser drawer was the same black gun that officers recovered from the dresser drawer that serves as the basis for his current charges. Therefore, with regard to Ms. Lockridge's testimony, we are satisfied that the trial judge appropriately considered the temporal proximity of the instance of prior possession and the crime charged, and compared the appearance of the gun in the prior instances of possession with the gun recovered in the charged offense, and as such did not abuse his discretion.

## B.      Admission of Children's Testimony

In addressing the children's testimony, we must first consider the appropriate standard. In the instant case, Mr. Smallwood's failure to object to each of the children's testimony when specifically asked with each proffer, after the trial court declined to rule on his pre-trial objection and announced that it would rule at trial, raises questions about whether an appellate challenge to that evidence was adequately preserved. If it were not, we would be required to analyze admissibility for plain error. *Malloy v. United States*, 186 A.3d 802, 814 (D.C. 2018) (citing *Muir v. District of Columbia*, 129 A.3d 265, 273 (D.C. 2016)). However, the government does not appear to broadly challenge whether Mr. Smallwood preserved his

objection to the children's testimony and we decline to advance such a challenge for them. Accordingly, we will analyze the admission of the children's testimony for harmless error.

We find it unnecessary to decide whether the children's testimony was *Drew* evidence or *Johnson* evidence or whether it was erroneously admitted, because we conclude that any error was harmless. This court will affirm the trial court despite a non-constitutional error if the error was harmless, that is if "the error did not influence the jury, or had but a slight effect." *Kotteakos v. United States*, 328 U.S. 750, 764 (1946). "But if [we] cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgement was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Id.* at 765. Accordingly, as this court has applied the *Kotteakos* standard, the central "issue is whether the record eliminates the appellate court's doubt about whether the error influenced the jury's decision." *Moghalu v. United States*, 263 A.3d 462, 472 (D.C. 2021) (citing *Washington v. United States*, 965 A.2d 35, 41 (D.C. 2009)).

Mr. Smallwood presses that the children's testimony was central to his convictions. The government argues that it had strong evidence of Mr. Smallwood's guilt, and that "the jury's verdict demonstrates that the testimony about

[Mr.] Smallwood's prior possession of a firearm did not inflame the jury." The government further points out that "[t]he gun and magazines were found in [Mr.] Smallwood's dresser; [Ms.] Lockridge testified that the gun belonged to [Mr.] Smallwood; and DNA evidence tied [Mr.] Smallwood to the gun."

After reviewing the record, we are satisfied that the testimony of the children did not substantially sway the jury's decision to convict Mr. Smallwood on charges related to possession of the gun. As Mr. Smallwood's brief points out, the children's testimony was far from ironclad and unimpeached. To illustrate, D.L. stated that he did not know when he saw Mr. Smallwood walk past his bedroom with a gun in hand and stated that nothing would refresh his memory about when that occurred. Thereafter, the government impeached D.L. with his grand jury testimony to establish that he made that observation shortly after Mr. Smallwood moved back into the apartment. At trial, A.L. stated that she was not sure whether she ever saw Mr. Smallwood with a gun. Similarly, when asked whether she ever saw Mr. Smallwood with a gun, E.L. testified, "I think I did, maybe it was something else. Maybe it was a phone or something . . . ." Furthermore, each of the children admitted to initially lying about whether they saw Mr. Smallwood with a gun. The children's testimony was not the strongest pillar of support in the government's case.

"This court recogniz[es] the jury's prerogative to weigh the evidence, determine the witnesses' credibility, and draw reasonable inferences from the evidence presented . . . ." *Payne v. United States*, 516 A.2d 484, 493 (D.C. 1986) (citing *Curley v. United States*, 160 F.2d 229, 232-33 (D.C. Cir. 1947)). Accordingly, we presume that the jury fulfilled its duty and considered the children's inconsistencies when making its decision. *Id.* ("[C]onflicts created by a witness' recantation, like other internal inconsistencies within a witness' testimony, are factual questions for the jury to resolve."). We are further strengthened in this presumption because each of the children also testified to seeing Mr. Smallwood violently assaulting their mother. The testimony of the children on that aspect of the case was fairly consistent and subject to fewer instances of impeachment. Nevertheless, the jury acquitted Mr. Smallwood on all charges related to the assault, kidnapping, and cruelty to children. For those reasons, we conclude that even if the trial judge erred in admitting the testimony of the children, any resulting error was harmless to Mr. Smallwood's conviction on the gun-related charges.

## IV.    Conclusion

For the foregoing reasons, we affirm the judgment of conviction.

*So ordered.*