# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,     )
                         )
v.                        )
                         )

| | |
|---|---|
| RASHAUN MILLER, | ) ID 1001009884 |
| OMAR BROWN, | ) ID 1009013840 |
| KAHLIL LEWIS, | ) ID 1111020024 |
| EUGENIA WATSON, | ) ID 1204003514 |
| SAMUEL TURNER, | ) ID 1207010321 |
| KALIEF RINGGOLD, | ) ID 1209004163 |
| JANARD BROWN, | ) ID 1209007265 |
| CURTIS FINNEY, | ) ID 1301022084 |
| | ) |
| Defendants. | ) |

Submitted: March 20, 2017
Decided: May 11, 2017

On Defendants' Motions for Postconviction Relief - **DENIED**

## MEMORANDUM OPINION

Elizabeth McFarlan, Esquire, Department of Justice, 820 N. French Street, Wilmington, DE 19801. Attorney for State of Delaware.

J. Brendan O'Neill, Esquire, Nicole Walker, Esquire, Office of Defense Services, 820 N. French Street, Wilmington, DE 19801. Attorneys for Defendants.

**CARPENTER, J.**

# I. INTRODUCTION

This decision concerns motions filed pursuant to Superior Court Criminal Rule 61 by the Office of Defense Services ("ODS") on behalf of eight defendants seeking postconviction relief based on conduct at the Office of the Chief Medical Examiner ("OCME") involving the mishandling of narcotics evidence. In 2014, the Delaware State Police and the Department of Justice ("DOJ") began investigating reports of criminal misconduct in the OCME's Controlled Substances Unit. The investigation has since been addressed in publicly available reports and a series of judicial opinions by the Delaware Supreme Court and the Superior Court.[1]

All eight defendants were convicted of drug-related offenses between 2010 and 2013. Five of these convictions resulted from guilty pleas, two defendants were convicted following stipulated bench trials, and one defendant was convicted after a jury trial. Their postconviction claims are all essentially premised upon the State's non-disclosure of potential impeachment or *Brady v. Maryland*[2] material concerning the misconduct at the OCME. The motions of the defendants who

---

[1] *See, e.g., State v. Irwin,* 2014 WL 6734821 (Del. Super. Ct. Nov. 17, 2014); *Brown v. State,* 108 A.3d 1201 (Del. 2015); *Aricidiacono v. State,* 125 A.3d 677 (Del. 2015); *AnzaraBrown v. State,* 117 A.3d 568 (Del. 2015); *Brewer v. State,* 2015 WL 4606541 (Del. July 30, 2015); *Patrick L. Brown v. State,* 2015 WL 3372271 (Del. May 22, 2015); *Cannon v. State,* 127 A.3d 1164 (Del. 2015). *See also* Office of the Attorney General, Investigation of Missing Drug Evidence: Preliminary Findings (June 19, 2014), http://www.attorneygeneral.delaware.gov/documents/OCME_Controlled_Substances_Unit_inve stigation_preliminary_findings.pdf.
[2] 373 U.S. 83 (1963).

pleaded guilty additionally assert that their pleas must be deemed "involuntary" under *Brady v. United States* and that the State must be estopped from arguing otherwise because of its position in other criminal proceedings, involving other criminal defendants.

The instant motions are just a small sample of the influx of filings made by and on behalf of over 700 criminal defendants following what has come to be known as "the OCME scandal." The ODS hand-selected the motions in these eight cases for the Court to decide and, because motions filed by the ODS in other cases are identical to those involved here, its decision in these matters should resolve many of the pending Rule 61 motions before the Court. Before addressing the procedural and legal issues raised in the motions, the Court will review the relevant facts of each defendant's case.

## II. FACTS

### A. Rashaun Miller

Rashaun Miller was arrested on January 14, 2010, after the Delaware State Police received specific information from a cooperating individual regarding a drug delivery. A large quantity of heroin and a firearm were recovered in connection with Miller's arrest and subsequently sent to the OCME for testing.[3] On March 1, 2010, a New Castle County grand jury indicted Miller on a number of

---

[3]The OCME report does not appear to be among the exhibits submitted in connection with Miller's Rule 61 motion.

3

drug and weapons offenses. A superseding indictment was entered on April 26, 2010, charging Miller with Trafficking in Heroin, Possession With Intent to Deliver, Possession of a Firearm During the Commission of a Felony ("PFDCF"), Maintaining a Vehicle, Possession of a Deadly Weapon by a Person Prohibited ("PDWPP"), Possession of a Firearm by a Person Prohibited ("PFPP"), Conspiracy Second Degree, and Resisting Arrest.

Miller filed a motion to suppress evidence, which the Court denied on June 2, 2010 following an evidentiary hearing. During the hearing, Miller's counsel stipulated to the heroin and the handgun located during the search incident to arrest. In exchange for Miller's willingness to proceed with a stipulated bench trial, the State entered a *nolle prosequi* as to the Trafficking, Maintaining a Vehicle, Conspiracy, PDWPP, PFPP, and Resisting Arrest charges. At the September 7, 2010 trial, the facts educed at the suppression hearing and the OCME report were admitted into evidence without objection. The Court found Miller guilty of Possession With Intent to Deliver and PFDCF and sentenced him to ten years at Level V, followed by eight months Level IV Halfway House and two years Level III probation.

Miller challenged the Superior Court's denial of this suppression motion on appeal, arguing that the police lacked reasonable articulable suspicion and probable cause to arrest and detain him. The Delaware Supreme Court rejected Miller's

4

contentions and affirmed the trial court's decision on August 11, 2011.[4] He filed his first *pro se* Motion for Postconviction Relief on October 12, 2011, which was denied on April 24, 2013 and affirmed on January 14, 2014.[5] On April 30, 2014, counsel filed the instant postconviction motion on Miller's behalf, along with eleven supplements thereafter.

### B. Omar Brown[6]

Omar Brown was arrested on September 16, 2010. A search incident to arrest uncovered $1,241 and what appeared to be crack cocaine in Brown's possession. On October 25, 2010, a New Castle County grand jury indicted Brown on charges of Possession with Intent to Deliver a Narcotic Schedule I Controlled Substance, Possession of a Controlled Substance within 300 Feet of a Park, Possession of a Controlled Substance within 1000 Feet of a School, and Criminal Impersonation. Brown filed a Motion to Suppress Evidence on December 29, 2010, which the Court denied following an evidentiary hearing. Brown elected to proceed with a stipulated trial, thereby preserving the right to appeal the Court's ruling on his suppression motion.

---

[4] *See Miller v. State*, 25 A.3d 768 (Del. 2011).
[5] *See Miller v. State*, 2014 WL 169804 (Del. Jan. 14, 2014). Appointed counsel filed a non-merits brief pursuant to Supreme Court Rule 26. Miller thus presented his claims to the Delaware Supreme Court *pro se*.
[6] There are two defendants discussed in this decision with the surname "Brown." To avoid confusion, the Court notes that it will refer to Omar Brown as "Brown" throughout the sections pertinent to his case, and Janard Brown by his surname when discussing his case.

The drugs recovered in Brown's case were sent to the OCME for testing. The lab report, completed by forensic chemist Theresa Moore on February 9, 2011, reflects that the substance tested positive for cocaine with a net weight of 2.28 grams.[7] At trial, Brown's counsel advised the Court that Brown would stipulate to the accuracy of the OCME lab report and that "there were drugs and they did weigh 2.2 grams."[8] On May 26, 2011, the trial judge found Brown guilty on all charges. He was sentenced as a habitual offender to a mandatory three-year term of incarceration followed by descending levels of supervision. The Delaware Supreme Court affirmed Brown's convictions on October 31, 2011.[9]

Brown filed his first *pro se* motion for postconviction relief on August 27, 2013. Conflict counsel was appointed and subsequently withdrew from representation. The ODS filed the instant motion on May 7, 2014 based on the misconduct at the OCME, in addition to two supplements filed December 21, 2015 and April 11, 2016.

### C. Kahlil Lewis

On November 28, 2011, Kahlil Lewis was arrested and subsequently indicted for Drug Dealing and PFDCF, following a search of the home he shared with two of his relatives, Idaes Lewis and Shaqille Lewis. Police suspected Idaes

---

[7] State's Resp. to Def.'s Mot. for Postconviction Relief, D.I. 57, Ex. A.
[8] D.I. 54 at 3.
[9] *See Brown v. State*, 2011 WL 5319900, at *1 (Del. Oct. 31, 2011).

6

and Shaqille in connection with two recent burglaries. While searching the Lewis' home for the stolen items, officers uncovered a box containing eight small bags filled with a white substance, which field-tested positive for heroin, and a wallet with Kahlil Lewis's ID.

While the probable cause affidavit for the arrest warrant and indictment both charge Lewis with possessing "heroin,"[10] the lab report completed by Irshad Bajwa of the OCME on April 10, 2012 identified the substances as "oxycodone tablets."[11] The State sent the report to Lewis's defense counsel on April 26, 2012. Despite the discrepancy between the drugs identified in the OCME report and the drugs he was charged with possessing, Lewis pleaded guilty to Drug Dealing on June 8, 2012.[12] During the plea colloquy, Lewis acknowledged that the drugs were heroin, which he claimed he received in exchange for Percocet.[13]

The Court sentenced Lewis to eight years Level V incarceration, suspended for one year of Level III probation. While on probation, Lewis was convicted of PFBPP and sentenced to seven years of total unsuspended time. He was sentenced

---

[10] State's Resp. to Def.'s Mot. for Postconviction Relief, D.I. 56, Exs. B, C.

[11] *Id.*, Ex. L.

[12] According to the State, the OCME report demonstrates that "the OCME ostensibly tested the wrong drugs" in connection with Lewis's case. *Id.* at 23 n. 51. Apparently the same drugs that were submitted to the OCME for testing in Kahlil Lewis's case were tested in connection with Ideas Lewis's case. The report completed in Ideas's case reflects that the substance tested positive for heroin. The State sent the lab report to Kahlil Lewis's counsel on July 27, 2012. "The State does not know whether [it] sent [this] lab report to Lewis's counsel on purpose, or if it was meant for Ideas's counsel." *Id.* at 6 n.3.

[13] *Id.*, Ex. N at 12:5-16.

to eight years at Level V for violating probation, served consecutive with the PFBPP sentence. Lewis's counsel filed this Motion for Postconviction Relief in light of the OCME investigation on May 9, 2014. Thirteen supplements were filed thereafter.

### D. Eugenia Watson

Eugenia Watson was arrested on April 5, 2012. She was indicted thereafter on charges of Drug Dealing Heroin, Aggravated Possession of Heroin, and Maintaining a Drug Property. Police seized a significant quantity of drugs in connection with Watson's arrest which field-tested positive for heroin and were sent to the OCME for further testing. According to the lab report, completed by forensic chemist Bipin Mody, a representative sample of the drugs tested positive for heroin.[14] The State faxed the report to Watson's counsel on October 12, 2012.

On October 23, 2012, Watson pleaded guilty to Aggravated Possession of Heroin in a Tier 5 quantity. Watson was declared a habitual offender and sentenced on January 11, 2013 to eight years Level V incarceration, followed by six months Level III probation. Watson filed her first postconviction motion on May 8, 2014 and has since filed thirteen supplements to that motion.

---

[14] State's Resp. to Def.'s Mot. for Postconviction Relief, D.I. 29, Ex. F. The report indicates the drugs were received on May 22, 2012. *Id.*

## E. Samuel Turner

Samuel Turner was arrested on July 12, 2012 and subsequently indicted on Drug Dealing and Possession of a Controlled Substance (tier five quantity) charges. Officers recovered approximately 53.4 grams of a substance which field-tested positive for cocaine in connection with Turner's arrest. The OCME lab report of Bipin Mody, dated December 5, 2012, indicated that the drugs tested positive for cocaine.[15] The State sent the OCME report to defense counsel on December 19, 2012.

On December 21, 2012, Turner pleaded guilty to two counts of Aggravated Possession of cocaine. Turner was sentenced as a habitual offender on March 8, 2013 to ten years of Level V incarceration, followed by six months of Level IV work release. His motion for postconviction relief was filed on June 19, 2014 and amended on December 12, 2014. Eleven supplements to the motion have also been filed.

## F. Kalief Ringgold

Kalief Ringgold was arrested on September 6, 2012. He was indicted on charges of Drug Dealing, Tampering with Physical Evidence, and Possession of a Controlled or Counterfeit Substance. A number of small blue bags filled with white powdery substance, $165 in cash, and four cell phones were recovered in

---

[15] State's Resp. to Def.'s Mot. for Postconviction Relief, D.I. 38, Ex. F.

Ringgold's possession at the time of his arrest. The white power field-tested positive for heroin.

Ringgold filed a Motion to Suppress on January 2, 2013. On January 7, 2013, Theresa Moore of the OCME tested the drugs in Ringgold's case and her report reflects that the substance tested positive for heroin.[16] Following a hearing on January 30, 2013, the trial court denied Ringgold's suppression motion. On February 7, 2013, Ringgold entered a plea agreement resolving his drug offenses in addition to other unrelated charges. He pleaded guilty to Drug Dealing and PFBPP, and was sentenced on the drug charge to thirteen years of Level V incarceration, suspended after three years for two years of Level III probation. Ringgold's postconviction motion was filed on June 19, 2014 and later amended on December 11, 2014. Eleven supplements to his amended motion have been filed.

### G. Janard Brown

Janard Brown was arrested on September 10, 2012. While conducting a search incident to arrest, police located $483 and what appeared to be crack cocaine on Brown's person. A New Castle County grand jury indicted Brown on charges of Drug Dealing and Driving While Suspended on November 5, 2012. He

---

[16] State's Resp. to Def.'s Mot. for Postconviction Relief, D.I. 40, Ex. F.

10

was reindicted on July 8, 2013 on Drug Dealing and Driving After Judgment Prohibited charges.

On April 23, 2013, Brown filed a motion to suppress, which the trial court denied following a hearing. At trial, Brown stipulated to the admission of an OCME lab report completed on December 26, 2012 by forensic chemist Patricia A. Phillips. Phillips's report identifies the drugs in Brown's case as 0.85 grams of cocaine.[17] The jury ultimately found Brown guilty of all charges and he was sentenced on October 11, 2013 to an aggregate nine years, followed by descending levels of supervision. The Supreme Court of Delaware affirmed Brown's convictions on October 9, 2014.[18]

On January 30, 2015, Brown filed a *pro se* motion for postconviction relief. Postconviction counsel then filed the instant motion on August 20, 2015 and two supplements to the motion were filed thereafter.

### H. Curtis Finney

Curtis Finney was arrested on February 7, 2013. The police recovered a number of drugs which field-tested positive for heroin and crack cocaine in connection with Finney's arrest. On April 15, 2013, a New Castle County grand jury issued an indictment charging Finney with Aggravated Drug Dealing, Conspiracy Second Degree, and Resisting Arrest.

---

[17] State's Resp. to Def.'s Mot. for Postconviction Relief, D.I. 71, Ex. A.
[18] *Janard Brown v. State*, 2014 WL 5099648 (Del. Oct. 9, 2014).

11

On June 4, 2013, one day prior to his scheduled "Fast Track" hearing, Finney pleaded guilty to one count of Drug Dealing. The plea agreement also resolved a violation of probation in connection with a 2012 conviction for Escape Second Degree. The same day, the Court sentenced Finney to eight years at Level V, suspended for 18 months of probation for the Drug Dealing offense and six months Level V for the Escape VOP.

Finney did not have an OCME lab report prior to entering his guilty plea. Nevertheless, he, through counsel from the ODS, moved for postconviction relief on May 9, 2014 based on the OCME misconduct. Fourteen supplemental pleadings have also since been filed.

## III. DISCUSSION

Prior to addressing the merits of a motion for postconviction relief, the Court would normally apply the procedural requirements set forth in Superior Court Criminal Rule 61.[19] Under Rule 61(i), the Court cannot consider postconviction motions that: (1) are filed more than one year after the final judgment of conviction;[20] (2) are repetitive or successive;[21] (3) contain claims not asserted in

---

[19] *See Maxion v. State*, 686 A.2d 148, 150 (Del. 1996).

[20] Super. Ct. Crim. R. 61(i)(1). A judgment of conviction is "final" for the purposes of Rule 61: (1) 30 days after the Superior Court imposes sentence and the defendant does not file a direct appeal; (2) when the Supreme Court issues a mandate or order finally determining the case on direct review of defendant's appeal or in the case of an automatic statutory review of a death penalty; or (3) when the United States Supreme Court issues a mandate or order finally disposing of the case on direct review of the defendant's petition for certiorari. Super. Ct. Crim. R. 61(m).

12

the proceedings leading to the judgment of conviction, unless both "cause for relief" from procedural default and "prejudice from violation of the movant's rights" can be shown; [22] or (4) that raise grounds for relief that were formerly adjudicated.[23] Rule 61(i)(5) sets forth certain exceptions, which, where applicable, allow the Court to consider an otherwise procedurally-barred postconviction claim.[24] Because Rule 61 was significantly amended on June 4, 2014, the Court will consider later in the Opinion *when* each defendant filed his or her respective motion and apply the version of the Rule in effect at that time.[25]

As will be outlined in Part D of this Opinion, most of the postconviction motions here are procedurally barred. That said, the Court believes it is only fair and appropriate to address the merits of the claims made in the various petitions

---

[21] Super. Ct. Crim. R. 61(i)(2) (prohibiting "successive motions"). The Rule was previously labeled as referring to "repetitive" motions. Super. Ct. Crim. R. 61(i)(2) (effective February 1, 2014).

[22] Super. Ct. Crim. R. 61(i)(3).

[23] Super. Ct. Crim. R. 61(i)(4).

[24] Super. Ct. Crim. R. 61(i)(5) (stating that the bars to postconviction relief shall not apply to claims that the Court lacked jurisdiction or to claims pleaded with particularity as required under Rule 61(d)(2)). This Rule was significantly modified by the June 4, 2014 amendments. The previous version of Rule 61(i)(5) allowed consideration of otherwise procedurally barred claims for claims that the Court lacked jurisdiction or for "colorable claim[s] that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity, or fairness of the proceedings leading to the judgment of conviction." Super. Ct. Crim. R. 61(i)(5) (effective February 1, 2014).

[25] *See Collins v. State*, 119 A.3d 42 (Del. 2015); *Younger v. State*, 580 A.2d 552, 554 (Del. 1990). Of the eight postconviction motions presently before the Court, five were filed before Rule 61 was amended on June 4, 2014. Accordingly, the Court will apply the prior version of Rule 61 effective February 1, 2014 to the motions filed by Defendants Miller, Omar Brown, Lewis, Watson, and Finney. The three remaining postconviction motions were filed subsequent to June 4, 2014. Consequently, the amended version of Rule 61 will govern the motions of Defendants Ringgold, Turner, and Janard Brown.

filed in these cases given the impact this decision is expected to have on hundreds of other pending motions seeking Rule 61 relief on identical grounds. In general, all of the motions argue that the State violated *Brady v. Maryland* by failing to disclose material impeachment evidence pertaining to the misconduct of OCME employees prior to the defendants' trials or the entry of his or her guilty plea. The motions of the defendants who pleaded guilty also assert that their pleas must be deemed "involuntary," in violation of the Due Process Clause of the Fourteenth Amendment, because they were influenced by egregious governmental misconduct and misrepresentations made by the State during discovery. Finally, these defendants contend that the State must be estopped from arguing their pleas were "knowing and voluntary" because it took an inconsistent position in "separate proceedings against separate criminal defendants."[26] As set forth below, all of these positions are without merit.

## A. *Brady v. Maryland*

The primary argument presented in these motions is that the State failed to disclose the ongoing misconduct at the OCME to the defendants at the time their cases were pending and such failure violated their rights under *Brady v. Maryland*. In *Brady v. Maryland*, the United States Supreme Court held that the State's failure

---

[26] Mot. to Estop the State from Arguing in Resp. to Pet'rs' OCME Post-Conviction Mots. that Because Pet'rs Admitted to Committing a Drug Offense Their Guilty Pleas Cannot be Vacated ("Estoppel Supp.") at 2.

to disclose evidence favorable to an accused violates the due process clause of the Fourteenth Amendment.[27] To comply with the State's obligations under *Brady*, a prosecutor must "disclose all relevant information obtained by the police or others in the Attorney General's Office to the defense" and uphold its duty "to learn of any favorable evidence known to the others acting on the government's behalf in the case...."[28] There are three components of a *Brady* violation: "(1) evidence exists that is favorable to the accused, because it is either exculpatory or impeaching; (2) that evidence is suppressed by the State; and (3) its suppression prejudices the defendant."[29] To satisfy the prejudice prong, a defendant is required to demonstrate that the suppressed evidence "creates a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[30]

The defendants assert that the State suppressed valuable impeachment evidence when it failed to disclose that the drugs submitted to the OCME were

[27] *See Brady*, 373 U.S. 83 (1963). *See also Wright v. State*, 91 A.3d 972, 977 (Del. 2014) ("A *Brady* violation occurs where the State fails to disclose material evidence that is favorable to the accused, because it is either exculpatory or impeaching, causing prejudice to the defendant.").
[28] *See Starling v. State*, 130 A.3d 316, 333 (Del. 2015), *reargument denied* (Jan. 14, 2016)
[29] *See Cannon*, 127 A.3d at 1169 n. 24 (quoting *Liu v. State,* 103 A.3d 515 (Del.2014) (Table)); *State v. Wright*, 67 A.3d 319, 324 (Del. 2013), *as amended* (May 28, 2013). The "failure to disclose exculpatory evidence,…does not, alone and without more, constitute a *Brady* violation." *Starling v. State*, 882 A.2d 747, 756 (Del. 2005) ("The State must release evidence only when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'").
[30] *See Starling*, 130 A.3d at 333 (emphasis in original) ("[T]he defendant need not show that 'the disclosure of the suppressed evidence would have resulted in an acquittal.'"). A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

15

being tampered with and/or stolen from the lab. This evidence was material, they maintain, because it would have frustrated the State's ability to authenticate and prove that the drugs in defendants' cases were, in fact, unlawful controlled substances. The motions of the defendants convicted at trial argue there is a reasonable probability the outcome of their trials would be different because information about ongoing misconduct at the OCME could have been used to cross examine forensic analysts and "seriously jeopardize[]" the State's ability to prove its case. The defendants who pleaded guilty maintain there is a reasonable probability they would have negotiated more favorable plea agreements or have gone to trial. Because the OCME-related evidence was not disclosed, the motions argue that the defendants' convictions must be vacated under *Brady v. Maryland.*

With regard to impeachment evidence, there is an important distinction between what the constitution demands of the State in the trial context versus prior to entering a plea agreement. "[I]mpeachment information is special in relation to the *fairness of a trial*...."[31] While the Constitution's "fair trial" guarantee entitles defendants to receive impeachment evidence from the State, "a defendant who pleads guilty forgoes a fair trial as well as various other accompanying constitutional guarantees."[32] Indeed, there is no constitutional requirement that the

---

[31] *See United States v. Ruiz*, 536 U.S. 622, 629, 633 (2002) (emphasis added).
[32] *See id.* at 623 (citing *Brady*, 373 U.S. at 87 and *Boykin v. Alabama*, 395 U.S. 238, 243 (1969)).

16

State "disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant[.]"[33]

In addressing OCME-related claims similar to those asserted here, the Delaware Supreme Court has made clear that "[a] defendant has no constitutional right to receive material impeachment evidence before deciding to plead guilty, and [a] knowing, intelligent, and voluntary guilty plea waive[s] any right...to test the strength of the State's evidence...at trial, including...chain of custody of...drug evidence."[34] The Court recognized, however, that "materially different situations" may justify a contrary result:

> For example, where a defendant entered a reluctant, but fully informed, no contest or guilty plea to lesser charges with no prison sentence to avoid the risk of a lengthy prison sentence on more serious charges, while proclaiming his factual innocence and expressing incredulity that the substance he claimed was legal had tested to be illegal narcotics, a later revelation that evidence planting had occurred in the relevant police department and that the defendant had been one of the victims of that misconduct, that situation could raise distinct considerations from those in this case, where the defendant freely admitted that he possessed illegal drugs.[35]

This situation is not present here. Defendants Lewis, Watson, Ringgold, Turner, and Finney freely admitted to possessing and/or dealing the controlled substances involved in their respective cases and, in doing so, relinquished any right to learn

---

[33] *See Brown*, 108 A.3d at 1206 (quoting *Ruiz*, 536 U.S. at 633).
[34] *See id.* at 1202.
[35] *See id.* at 1206 n.30.

of impeachment evidence.[36] None of these defendants assert their pleas were false or make claims of actual innocence. As such, "[n]othing about the regrettable problems at the OCME…caused any injustice to" these defendants under *Brady v. Maryland*.[37]

With regard to the defendants who were convicted at trial, the motions ignore that the identity and weight of the drugs was *undisputed* in all three cases. Facts concerning the controlled substances and the OCME lab reports were stipulated to and admitted into evidence without objection. Our courts have recognized that, "[w]here a defendant knowingly, intelligently, and voluntarily agreed to stipulated facts at trial regarding the drug evidence in that matter, the defendant has waived his [or her] right to test the chain of custody of that drug evidence."[38] Because there was no testimony by OCME employees presented at these trials, defendants' assertion that they were denied the opportunity to use the impeachment evidence on cross-examination holds little weight.[39] Rather,

---

[36] *See id.*

[37] *See id.* at 1207.

[38] *See State v. Burton*, ID No. 1301022871, at 8 (Del. Super. Nov. 30, 2015) (citing *Brown*, 108 A. 3d at 1205-06), *aff'd Burton v. State*, 142 A.3d 504 (Del. 2016).

[39] *See Demby v. State*, 148 A.3d 1170 (Del. 2016) ("There was…no testimony from any OCME employee that might be impeached by any mishandling that might have occurred there."). *See also Pendleton v. State*, 36 A.3d 350 (Del. 2012) (Table) (noting that the "very purpose of the stipulation" there "was to obviate the need for live testimony").

18

Defendants Miller, Omar Brown, and Janard Brown effectively waived their rights to challenge the drug evidence at trial.[40]

Further, there is no indication that evidence of misconduct by OCME employees would have altered the outcome of these defendants' trials. In all three cases, there was significant evidence of guilt, as discussed further *infra*.[41] Additionally, neither Mr. Miller nor Omar Brown provided any evidence to support that the events at the OCME affected their cases specifically.[42] While the drugs in Janard Brown's case were tested by Patricia Phillips, a former OCME chemist who was implicated in the investigation, the testing occurred in 2012 and the personnel documents supplied indicate that the three incidents of evidence mishandling leading to her suspension and resignation occurred in 2015. This evidence did not exist at the time of Janard Brown's trial and cannot, as a result, support a claim under *Brady*.[43] Ultimately, any potential impeachment evidence

---

[40] *See Hunt v. State*, 80 A.3d 960 (Del. 2013) ("[T]he Medical Examiner's report was admitted into evidence without objection by the defense because the identity and weight of the drugs was not in dispute at the trial....As such, Hunt's stipulation constituted a waiver of any objection to the admission of the Medical Examiner's report. Moreover, because the report was not testimonial in nature, there was no violation of Hunt's Sixth Amendment right of confrontation."); *Burton*, ID No. 1301022871, at 8 (citing *Brown*, 108 A.3d at 1205-06).

[41] *See Cannon*, 127 A.3d at 1169 (finding overwhelming evidence of guilt would "neutralize" any possible *Brady* violation).

[42] It is unclear who tested the drugs in Mr. Miller's case, as it appears no OCME report was submitted with his postconviction motion. Omar Brown's drugs were tested by Theresa Moore. While defense counsel raises the misconduct of a number of specific OCME employees, Theresa Moore does not appear to be one of them.

[43] *See Demby v. State*, 148 A.3d 1170 (Del. 2016) (Table) ("Given the fact that the Dollard Evidence did not exist at the time of Demby's trial in 2013, Brady is not the proper framework

based on the OCME misconduct does not place the convictions of these defendants in such a light so as to "undermine confidence" in their guilty verdicts.[44]

Importantly, in all of these cases, the defendants never contested that the substances seized from them upon arrest were not illegal drugs. While some cases involve lab reports completed by former OCME employees whose conduct was implicated following the investigation, that "does not mean that the State had any evidence or knowledge of the drylabbing at the time" these defendants were tried or entered pleas between 2010 and 2013.[45] Evidence of the unfortunate practices and events transpiring at the OCME did not exist until early 2014, and there can be "no retroactive Brady violation for failing to report what was not known."[46]

## B. Voluntariness of Pleas Under *Brady v. United States*

The motions of defendants who pleaded guilty to drug offenses additionally argue that, regardless of whether the State was required to disclose general impeachment evidence prior to their plea agreements, their pleas must be deemed involuntary under *Brady v. United States*[47] due to: (1) egregious government misconduct, and (2) the State's representation, regardless of good faith, that it had

---

here."); *Cannon*, 127 A.3d at 1168-69; *Hickman v. State*, 2015 WL 4066797, at *2 (Del. Supr. July 1, 2015).

[44] *See Cannon*, 127 A.3d at 1168-69; *Jackson v. State*, 770 A.2d 506, 517 (Del. 2001).

[45] *See Cannon*, 127 A.3d at 1168.

[46] *State v. Absher*, 2014 WL 7010788, at *1 (Del. Super. Ct. Dec. 3, 2014), *aff'd sub nom. Aricidiacono v. State*, 125 A.3d 677 (Del. 2015).

[47] 397 U.S. 742 (1970).

produced all *Brady v. Maryland* material.[48]  These arguments are likewise without merit.

Because a defendant's decision to plead guilty to a criminal offense entails a simultaneous waiver of certain constitutional rights, due process demands that decision be knowingly, intelligently, and voluntarily made.[49]  Under *Brady v. United States*, a guilty plea is "involuntary" if "induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper...(e.g. bribes)."[50]  As long as a defendant can "'with the help of counsel, rationally weigh the advantages of going to trial against the advantages of pleading guilty,'... there is no constitutional cause for concern."[51]

In *Brewer v. State*[52] and *Aricidiacono v. State*,[53] among other decisions,[54] the Delaware Supreme Court rejected claims nearly identical to those raised in the instant motions.  Like the defendants here, the defendants in those cases knowingly admitted to possessing and/or dealing illegal drugs and, in seeking postconviction relief, never once argued they were in fact innocent or that their pleas were false or

---

[48] Letter, Mar. 17, 2017.

[49] *See McCarthy v. United States*, 394 U.S. 459, 466 (1969).

[50] *See Aricidiacono*, 125 A.3d at 679 (quoting *Brady*, 397 U.S. at 755).

[51] *Brewer v. State*, 119 A.3d 42 (Del. 2015) (quoting *Brady v. United States*, 397 U.S. at 750).

[52] 2015 WL 4606541 (Del. Supr. July 30, 2015).

[53] 125 A.3d 677 (Del. 2015).

[54] *See, e.g., Turnage v. State*, 127 A.3d 396 (Del. 2015) (TABLE); *McMillan v. State*, 115 A.3d 1215 (Del. 2015) (TABLE); *Banks v. State*, 129 A.3d 881 (Del. 2015) (TABLE) .

21

coerced.[55] Nor did the defendants in *Aricidiacono* and *Brewer* contend that the State knew about the problems at the OCME at the time of their pleas and failed to disclose those problems. Instead the defendants claimed, like defendants do here, that they "would not have pled or would have gotten better deals if they had known of the problems at the OCME."[56] Under such circumstances, the Delaware Supreme Court has made clear that, absent allegations of factual innocence or improper coercion by the State, the problems at the OCME supply no basis for setting aside a defendant's knowing, valid guilty pleas as involuntary.[57]

Further, in *Aricidiacono*, the Court noted that "even if there was conduct at the OCME that could be said to be *egregious*, we have determined, in accordance with our prior reasoning ..., that this conduct did not materially affect any of the pleas."[58] On this point, the Court emphasized that the defendants there either entered pleas before receiving OCME reports or failed to contend that their pleas

---

[55] *Aricidiacono*,125 A.3d at 680-81, n.24; *Brewer*, 2015 WL 4606541, at *2.

[56] *Aricidiacono*, 125 A.3d at 679; *Brewer*, 2015 WL 4606541, at *1-3 ("Brewer claims that the positive OCME drug test results were a significant factor in his decision to plead guilty and that he would not have pled guilty if he had known of the misconduct at the OCME.").

[57] *Aricidiacono*,125 A.3d at 680.

[58] *See id.* at 680 n.30 (emphasis added). Defendants "egregious conduct" argument is based on the First Circuits decision in *Ferrara v. United States,* 456 F.3d 278 (1st Cir. 2006). There, the Court held that a defendant's plea would not be set aside as involuntary unless it can be shown that: (1) egregious prosecutorial misconduct preceded entry of the plea; and (2) this misconduct materially influenced his or her decision to plead guilty *Ferrara,* 456 F.3d at 290 (citing *Brady*, 397 U.S. at 755; *Correale v. United States*, 479 F.2d 944, 947 (1st Cir. 1973); and *Cepulonis v. Ponte*, 699 F.2d 573, 577 (1st Cir.1983)). The *Ferrara* Court identified the assessment of these elements as requiring consideration of "the totality of the circumstances surrounding the plea." *See id.* (citing *Brady*, 397 U.S. at 749). In *Aricidiacono*, the Court addressed *Ferrara* and declined to adopt the First Circuit's "gloss on *Brady v. United States*" in reaching its decision. *Aricidiacono*,125 A.3d at 680 n.30.

were false because of some improper government misconduct; "rather in each case, the defendant knowingly admitted to his [or her] unlawful possession of illegal drugs."[59]

The same is true of the defendants here.[60] There is nothing to indicate these defendants' pleas were anything less than knowing, voluntary, and entered following full and complete colloquies, during which they freely admitted to possessing illegal controlled substances.[61] Noticeably absent from the instant motions is any allegation of improper coercion or anything to suggest these defendants were "strong-armed by State agents" in a manner that compromised their abilities to rationally weigh the advantages and disadvantages of trial.[62] Defendants' argument that they were "affirmatively misled" by the State's representation in standard discovery forms that "at that time" the State was unaware of any *Brady v. Maryland* material other than the enclosed materials is unpersuasive.

---

[59] *See Aricidiacono*,125 A.3d at 680 n.30.

[60] Defendant Finney did not receive a lab report prior to entering his plea. It is unclear whether Defendant Ringgold was in receipt of the OCME report in his case prior to pleading guilty. Otherwise, all of the defendants received the results of their OCME lab tests prior to entering their pleas.

[61] *See Aricidiacono*,125 A.3d at 677 n.1 ("Although the defendants have not cited to every plea colloquy, none points to any evidence suggesting that there is any reason to believe that any colloquy was less than full and complete. Those colloquies in the record were of that nature and given the assiduousness of defense counsel, any deficiency in a particular colloquy would presumably been brought to the Superior Court's and our attention.").

[62] *See Brewer*, 119 A.3d 42 (Del. 2015)

23

Ultimately, "it may be the case that knowing about the OCME problems would have given the defendants more bargaining leverage," but clear Delaware precedent prevents the Court from finding "that possibility…a basis for concluding that the defendants were unfairly convicted after a voluntary plea."[63] Given the absence of any rational allegation that the guilty pleas here had been coerced or falsely made, the Court finds no basis to upset defendants' convictions.

## C. Estoppel

Finally, defendants argue that the State should be "estopped" from arguing their pleas were voluntary based on the State's earlier request in an unrelated case that the guilty plea be vacated based on the OCME misconduct.

In that case, Eric Young pleaded guilty to drug dealing and second degree conspiracy in September 2013. His co-defendant, Jermaine Dollard, was convicted in November 2013 following a week-long jury trial of drug dealing, aggravated possession of cocaine, and second degree conspiracy. Dollard maintained, throughout trial and on appeal, that the substance seized from him was not cocaine.[64] While Dollard's case was on direct appeal, the State learned of the conduct occurring at the OCME and the Delaware Supreme Court stayed the

---

[63] *See Aricidiacono,*125 A.3d at 678, 681 ("[I]f a defendant knowingly pled guilty to a drug crime, he [or she] could not escape [the] plea by arguing that had he [or she] known that the OCME had problems, he [or she] would not have admitted to [the] criminal misconduct in possessing illegal narcotics.").
[64] *See Brown,* 117 A.3d at 580 (citing *State v. Dollard,* No. 1206010837).

appeal and remanded the case to the Superior Court. The trial judge ordered the drugs in Dollard's case be retested, which revealed the substance in his case was not an illicit substance. In the meantime, Young filed a Rule 61 motion. Because Young's indictment was based upon the same drugs used to convict Dollard, the State agreed to allow Young to withdraw his guilty plea. There is no indication that the State, in agreeing to this course of action, ever took the position that Young's original plea was "involuntary." Nevertheless, a new deal was negotiated and Young pleaded guilty to second degree conspiracy.

Under the doctrine of judicial estoppel, "a party may be precluded from asserting in a legal proceeding, a position inconsistent with a position previously taken by him [or her] in the same or in an earlier legal proceeding."[65] Application of the doctrine here would be limited to the State's previous positions in proceedings involving the *same defendant*.[66] Importantly, the doctrine is "narrowly construed and rarely applied against the government in criminal prosecutions."[67]

In *State v. Burton*, the Court confronted a similar argument to that presented in the instant motions and found judicial estoppel inapplicable to defendant

---

[65] *See Burton*, ID No. 1301022871, at 9 (emphasis added) (quoting *State v. Chao*, 2006 WL 2788180, at *9 (Del. Super. Sept. 25, 2006)).

[66] *See id.* at 10.

[67] *See Banther v. State*, 977 A.2d 870, 884 (Del. 2009). *See also Burton*, ID No. 1301022871, at 9 ("The doctrine of judicial estoppel has never been applied in Delaware against the government.").

Burton's case because he sought to invoke the doctrine based not on proceedings in his own case, but in "two different cases:" *State v. Dollard* and *State v. Young*.[68] The *Burton* Court's decision was affirmed on appeal by the Delaware Supreme Court.[69] Because defendants' judicial estoppel argument is based on an entirely separate proceeding, unrelated to their prosecutions, it must fail.

## D. Procedural Requirements

### 1. Rashaun Miller

This is Rashaun Miller's second motion for postconviction relief filed on his behalf by the ODS on April 30, 2014.[70] His claims are procedurally barred under Rules 61(i)(1) and (2). Miller first sought postconviction relief in October 2011, and unsurprisingly, that motion did not raise his present concerns based on *Brady v. Maryland* and the OCME.[71] Further, even if consideration was warranted in the "interest of justice," Miller's claims are untimely under Rule 61(i)(1) because this motion comes nearly three years after the Delaware Supreme Court affirmed his

---

[68] *See Burton*, ID No. 1301022871, at 4 n.3, 10.

[69] *Burton v. State*, 2016 WL 3381847 (Del. Supr. June 8, 2016).

[70] The version of Rule 61 in effect prior to the June 2014 amendments controls Miller's motion.

[71] Rule 61(i)(2) prevents the Court from considering "[a]ny ground for relief that was not asserted in a prior postconviction proceeding, as required by subdivision (b)(2) of this rule,…unless consideration…[is] warranted in the interest of justice."Super. Ct. Crim. R. 61(i)(2) (effective Feb. 1, 2014), amended June 4, 2014. Rule 61(b)(2) requires a movant include among the contents of his or her motion "all…grounds for relief…*available to the movant and of which the movant has or, by the exercise of reasonable diligence, should have knowledge*[.]" Super. Ct. Crim. R. 61(b)(2) (emphasis added).

26

convictions on August 11, 2011.[72] Miller's claim will thus be time-barred unless Rule 61(i)(5) is applicable.[73]

As discussed above, Miller cannot show a colorable claim of a miscarriage of justice. Miller was convicted of possessing heroin with intent to distribute and PFDCF following a stipulated bench trial in 2010. The record reflects Miller agreed to the stipulated trial in exchange for the State's agreement to dismiss a number of charges in the indictment for which he faced a lengthy minimum mandatory sentence. Prior to proceeding with the stipulated trial, the Court conducted a colloquy and found Miller's election to be tried accordingly knowing and voluntary. At trial, the facts regarding the heroin and handgun seized in connection with Miller's arrest were stipulated to and OCME report was admitted into evidence without any objection by Miller.[74] By knowingly, intelligently, and voluntarily agreeing to stipulated facts at trial regarding the drug evidence, Miller "waived his right to test the chain of custody of that drug evidence."[75]

Even if this were not the case, evidence of OCME misconduct could not reasonably be taken to put Miller's case "in such a different light as to undermine

---

[72] Super. Ct. Crim. R. 61(i)(1), (m).

[73] Super. Ct. Crim. R. 61(i)(5) (effective Feb. 1, 2014), amended June 4, 2014. "A colorable claim of a *Brady v. Maryland* violation falls within this exception." *State v. Wright*, 67 A.3d 319, 324 (Del. 2013), *as amended* (May 28, 2013).

[74] State's Resp. to Def.'s Mot. for Postconviction Relief, D.I. 94, Ex. B at 24, Ex. C at 4, 12-13.

[75] *See Burton*, ID No. 1301022871, at 8 (citing *Brown*, 108 A. 3d at 1205-06).

27

confidence in the verdict."[76]  Miller presents no specific information linking the OCME misconduct to the drugs tested in connection with his 2010 trial.  He never objected to the identification, weight, or chain of custody of the drugs, nor does he presently contend he was in fact innocent of possessing heroin at the time of his arrest.  Further, the record reflects that, after being informed of his *Miranda* rights, Miller confessed to police that he obtained the handgun recovered in the search in exchange for "two bundles of heroin"[77]  Without ever learning of the precise quantity of heroin seized by police (thirty "bundles"), Miller was overheard during a phone call stating "they got us with 30 bundles of heroin and my gun."[78]

Miller has failed to allege a "colorable claim" under Rule 61(i)(5) and the motion must be denied as untimely.

### 2. Omar Brown

Omar Brown, through postconviction counsel, filed this Motion for Postconviction Relief on May 7, 2014.[79]  To comply with Rule 61(i)(1), Brown was required to file this motion within one year of October 31, 2011 – the date his convictions were affirmed on appeal.  The motion is thus untimely and must be barred unless Rule(i)(5) applies.

---

[76]*See Cannon*, 127 A.3d at 1169 n.26 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).
[77] State's Resp. to Def.'s Mot. for Postconviction Relief, D.I. 94, Ex. B at 26.
[78] *Id.* at 27-28.
[79] Brown's motion was filed on May 8, 2014, prior to the June 4, 2014 amendments to Rule 61. As such, the former version of the rule applies.

Like Miller, Brown was convicted at a stipulated trial. On May 26, 2011, the Court found Brown guilty of Possession with Intent to Deliver a Narcotic Schedule I Controlled Substance, Possession of a Controlled Substance within 300 Feet of a Park, Possession of a Controlled Substance within 1000 Feet of a School, and Criminal Impersonation. The record reflects that Brown's counsel acknowledged that the only issue for appeal following trial would be the court's ruling denying Brown's suppression motion and that counsel stipulated to the accuracy of the OCME lab report, to the existence of the drugs, and to the weight of the drugs recovered. [80] Brown's knowing and intelligent stipulation to facts regarding the drug evidence and OCME report waived his right to challenge that evidence.[81]

### 3. Kahlil Lewis

This is Kahlil Lewis's first postconviction motion, filed May 9, 2014. Lewis pleaded guilty to Drug Dealing on June 8, 2012 and was sentenced accordingly that same day. Lewis's conviction became final for purposes of Rule 61 thirty days later. His postconviction motion is untimely and procedurally defaulted, and thus, must be barred unless Rule 61(i)(5) applies.

Like the defendant in *Ira Brown*, Lewis signed a valid plea agreement, completed a Truth-in-Sentencing Guilty Plea form, and admitted that he was guilty

---

[80] D.I. 54 at 3.
[81] *See Burton*, ID No. 1301022871, at 8 (citing *Brown*, 108 A.3d at 1205-06).

of knowingly possessing heroin with intent to deliver during a valid plea colloquy.[82] The Court accepted Lewis's plea as knowingly, voluntarily, and intelligently made.[83] Lewis will be bound by the statements he made to the Superior Court and prevented from reopening his case based upon *Brady v. Maryland* "to make claims that do not address his guilt and involve impeachment evidence that would only be relevant at trial."[84]

In addition, there is nothing to support that the State knew of the OCME misconduct when its discovery responses were provided or at the time of Lewis's plea to indicate that Lewis could have been misled or coerced by the State. Lewis has not established a colorable claim of a miscarriage of justice under Rule 61(i)(5), and his motion is procedurally barred. His requests for discovery, retesting, and a hearing are denied.

### 4. Eugenia Watson

This is Eugenia Watson's first postconviction motion, filed on May 8, 2014. Watson pleaded guilty to aggravated possession of heroin on October 23, 2012 and her judgment of conviction became final 30 days after the Court imposed her sentence on January 11, 2013. Because Watson's motion was filed outside the

---

[82] State's Resp. to Def.'s Mot. for Postconviction Relief, D.I. 56, Ex. N at 5-6. During the colloquy, Lewis informed the judge that he had traded Percocets for the eight bags of heroin he was charged with possessing. *Id.* at 11-12.

[83] *Id.* at 9.

[84] *See McMillan*, 2015 WL 3444673, at *2; *Brown*, 108 A.3d at 1206 (finding that, by pleading guilty, Brown "gave up his right to trial and his right to learn of any impeachment evidence").

prescribed period, it is untimely under Rule 61(i)(1). Nor can her claims be saved by the exceptions set forth in Rule(i)(5) because, like the other defendants challenging their pleas, the *Brady v. Maryland* and voluntariness arguments set forth in Watson's motion based on the problems at the OCME are meritless as discussed in detail above. Her postconviction claims must therefore be barred, and any request for drug retesting or an evidentiary hearing is denied.

### 5. Samuel Turner

Samuel Turner's first postconviction motion was filed on June 19, 2014. As such, the version of the rule effective June 4, 2014 is applicable to his request for postconviction relief. While Turner and other similarly situated defendants argue against this result, claiming the June 4, 2014 amendments to Rule 61 are unconstitutional, they do so to no avail as the Delaware Supreme Court has already found that position without merit.[85]

Turner pleaded guilty to Aggravated Possession of Cocaine on December 21, 2012 and his conviction became final 30 days from the date on which he was sentenced, March 8, 2013. Because Turner's motion was filed outside the one-year time period, it is barred under Rule 61(i)(1).[86] In order to

---

[85] *See Turnage v. State*, 2015 WL 6746644, at *1 (Del. Nov. 4, 2015) ("Turnage argues that the version of Rule 61 in effect before June 4, 2014 should apply to her motion because the June 4, 2014 amendments to Rule 61 contain unconstitutional restrictions on her right of access to the courts, violate due process, and are impermissibly retroactive. These claims are without merit.").
[86] Turner also argues the doctrine of equitable estoppel warrants finding Rule 61's time limitation inapplicable to his postconviction claim. In that respect, Turner urges the Court to use

31

avoid this result, Rule 61(i)(5), as amended, required Turner to plead with particularity that (1) new evidence exists creating a strong inference that he is actually innocent in fact or (2) a new rule of constitutional law, retroactively applicable to cases on collateral review, applies and renders his conviction invalid.[87]

While the motions before the Court plead the existence of "new evidence" based on the findings of misconduct of employees at the OCME, Turner has failed to allege how such evidence creates a strong inference he was "actually innocent" of the crimes to which he pleaded guilty. Turner does not argue that he was not, in fact, in possession of cocaine and that his plea was somehow false. Turner cannot, therefore, overcome Rule 61's procedural bar and his postconviction motion is denied.

---

February 21, 2014, when the State first alerted the ODS about the investigation, rather than the date his judgment of conviction became final for purposes of determining his motion's compliance with Rule 61(i)(1)'s one-year time limit. This argument is unavailing, however, as the Delaware Supreme Court has made clear "that the doctrine of equitable tolling is inapplicable to a motion for postconviction relief. *See id.* at *2 (citing *Chapman v. State*, 2007 WL 1933229, at *2 (Del. July 3, 2007)).

[87] Super. Ct. Crim. R. 61(i)(5).

## 6. Kalief Ringgold

Kalief Ringgold filed this first motion for postconviction relief on June 19, 2014 and, as such, Rule 61, as amended June 4, 2014, applies.[88] Under Rule 61(i)(1), Ringgold was required to file for postconviction relief within one year from the date his conviction became final. Ringgold pleaded guilty to and was sentenced for Drug Dealing and PFBPP on February 7, 2013 and his judgment of conviction became final under Rule 61 thirty days later. This motion was not filed until June 2014, and will thus be time-barred unless Rule 61(i)(5) applies. Rule 61(i)(5) will allow the Court to consider the merits of Ringgold's motion only if it alleges the Superior Court lacked jurisdiction or pleads with particularity that (1) new evidence exists creating a strong inference that he is actually innocent in fact or (2) a new rule of constitutional law, retroactively applicable to cases on collateral review, applies and renders his conviction invalid.[89]

Ringgold's motion makes the same four arguments discussed in preceding sections with regard to defendants who opted to plead guilty to the drug offenses with which they were charged and accordingly, will be denied on similar grounds. Ringgold signed a plea agreement and Truth-in-Sentencing Guilty Plea form, on which he responded "yes" to the question," [h]ave you freely and voluntarily

[88] Ringgold likewise argues that the June 4, 2014 amendments to Rule 61 are unconstitutional. As discussed with regard to Mr. Turner above, this argument is meritless. *See Turnage*, 2015 WL 6746644, at *1.
[89] Super. Ct. Crim. R. 61(i)(5), 61(d)(2).

decided to plead guilty to the charges listed in your written plea agreement," and "no" when inquired about whether he had been "threatened or forced" to enter the plea. While the motions before the Court may allude to new evidence as a result of the OCME investigation, not one of these defendants alleges they were not in fact in possession of or dealing illicit substances or that the guilty pleas they knowingly and voluntarily entered were false when made. Rule 61(i)(5) cannot save Ringgold's procedurally-barred claims.[90]

### 7. Janard Brown

In 2013, a jury found Janard Brown guilty of Drug Dealing and Driving After Judgment Prohibited. On October 30, 2013, a notice of appeal was filed. The Delaware Supreme Court affirmed Brown's convictions on October 9, 2014. He timely filed this first motion for postconviction relief on January 30, 2015, arguing the State violated *Brady v. Maryland* by failing to disclose material impeachment evidence of the misconduct at the OCME prior to his trial in 2013. There is nothing in the record indicating Brown raised this claim in seeking relief from the Delaware Supreme Court on appeal or asked that his case be returned to the Superior Court after the OCME scandal had been publicly disclosed.[91]

---

[90] *See Aricidiacono*, 125 A.3d at 679-681; *Brewer*, 2015 WL 4606541, at *2-3.

[91] On appeal, Brown argued: "(1) that the police officer who arrested [him] did not have probable cause…; (2) that the police officer did not have reasonable suspicion to stop and frisk him; (3) that, under Delaware law, a police officer may not summarily arrest a suspect for driving with a suspended license; and (4) that [his] sentence for drug dealing violated due process." *Brown*, 2014 WL 5099648, at *1 ("We find no merit to these arguments and affirm.").

Brown's postconviction motion is procedurally defaulted under Rule 61(i)(3).[92] To overcome this procedural bar, Brown must show cause for relief from default and actual prejudice, or satisfy the requirements of Rule 61(i)(5).[93] In order to avoid default under Rule 61(i)(3), Brown was required to allege (1) that an "external impediment" prevented him from constructing or raising his claim either at trial or on direct appeal and (2) how evidence of the OCME misconduct would have altered the outcome of his trial.[94]

At his trial in 2013, Brown stipulated to the admission of the OCME lab report reflecting that the drugs in his case tested positive for cocaine.[95] The misconduct at the OCME was not revealed until February 2014. While Brown raises the misconduct of specific chemists at the OCME, those chemists are either not alleged to have had any involvement in his case or were reprimanded for conduct engaged in over a year after Brown's trial and involving drug evidence submitted in connection with different cases.

[92] Super. Ct. Crim. R. 61(i)(3).
[93] Super. Ct. Crim. R. 61(i)(3)(A)-(B), (5).
[94] See Cannon, 127 A.3d 1164; State v. Loper, 2016 WL 3621547, at *7 (Del. Super. Ct. June 27, 2016) (finding that where defendant "was not charged with possession of the drug seized and tested by the OCME, nor was the drug evidence presented at trial," there could be no showing that the "OCME's malfeasance had any bearing on his case, or that it resulted in prejudice sufficient to negate the procedural bar to his claim…").
[95] D.I. 66 at 21. See Bunting v. State, 2015 WL 2147188, at *2 (Del. Supr. May 5, 2015) ("As the State points out…, Bunting specifically waived his right to have each person in the chain of custody testify at his 2005 trial. In fact, the Superior Court noted on the trial record that there was 'no legitimate issue' with regard to chain of custody in Bunting's case. Indeed, in his defense at trial, in his direct appeal, and in all of his postconviction proceedings, Bunting has never challenged the validity of the forensic testing or the chain of custody of the drug evidence.").

Importantly, the misconduct of these former employees did not in any way involve "evidence-planting." As the Delaware Supreme Court continues to emphasize with regard to the OCME investigation, "much of the uncovered misconduct seemed to be inspired by the reality that the evidence seized from defendants in fact involved illegal narcotics, and the temptation this provided to certain employees to steal some of that evidence for their personal use and for resale."[96] "[T]o date nothing has surfaced to suggest the OCME was falsifying evidence."[97] Consistent with these remarks, the corrective action reports related to the chemist allegedly involved in Brown's case relay three occasions, beginning in October of 2014, on which bags of heroin went "missing" or were misplaced.

Even if Brown alleged some kind of link between the conduct of specific OCME employees and the drugs at issue in his case, there is still no indication that the State had any evidence or knowledge of any wrongdoing occurring at the OCME in 2013 at the time of Brown's trial. The Delaware Supreme Court has consistently held that, because the wrongdoing at the OCME was not known until

---

[96] *Aricidiacono*, 125 A.3d at 678; *Brown*, 108 A.3d at 1202–03 ("[T]he investigation has yielded no indication that the OCME scandal involved the planting of false evidence to wrongly convict criminal defendants. Rather, it has mostly consisted of instances where employees stole evidence that they knew to be illegal narcotics for resale and personal use. That is, that misconduct occurred because the drugs tested by the OCME were in fact illegal drugs desired by users.").
[97] *Cannon*, 127 A.3d at 1168.

February 2014, incidents occurring prior to that time fail to qualify as *Brady* material.[98]

Nor has Brown satisfied the pleading requirements set forth in Rule 61 (d)(2) such that his postconviction claims could overcome procedural default under Rule 61(i)(5). While Brown has alleged the existence of new evidence involving the OCME, he has not, as detailed above, "plead with particularity how that evidence affected his conviction."[99] Nor has Brown alleged actual innocence. "The mere existence of the ongoing scandal at the OCME does not *ipso facto*…create a strong inference that the defendants are actually innocent."[100]

### 8. Curtis Finney

This is Curtis Finney's first postconviction motion, which was timely filed and otherwise complies with Rule 61(i)'s procedural requirements. Finney requests that his plea of guilty to one count of Drug Dealing, entered June 4, 2013, be vacated based on the State's misrepresentation that it provided all *Brady v. Maryland* material, which he contends made his plea involuntary pursuant to *Brady v. United States*. Finney also advances the argument that the State should be

---

[98] *See id.* at 1168-69. *See also State v. Hamilton*, 2016 WL 807729, at *4 (Del. Super. Ct. Mar. 1, 2016) ("Finally, the OCME controversy did not surface until 2014—approximately two years after Hamilton's trial and conviction. Accordingly, there is no evidence that the State failed to disclose impeachment evidence.").

[99] *See id.* at 1167.

[100] *Id.* 1168–69 (quoting *State v. Anderson*, 2015 WL 2067158, at *3 (Del. Super. Apr. 20, 2015)).

estopped from arguing his plea was voluntary based on the State's position with regard to Eric Young.

The Court finds no merit to Finney's postconviction claims. While the drugs recovered in connection with Finney's case field-tested positive for crack cocaine and heroin, there is nothing in the record to indicate those substances had even been sent to the OCME for testing or that Finney obtained an OCME lab report prior to entering his guilty plea.[101] Nor does Finney claim the State actually knew about the problems at the OCME. Yet, Finney asserts the State "mislead" him and that awareness of the OCME misconduct would have "factored into his decision" as to whether to enter the plea agreement.[102]

"When a defendant pleads guilty he or she, of course, foregoes not only a fair trial, but also other accompanying guarantees."[103] Impeachment information, like that pertaining to the OCME, "is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary*."[104] The "Constitution does not require the [State] to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant."[105] Further, there is nothing to support that the State in any way affirmatively misrepresented the existence of *Brady*

---

[101] ODS's Supp. to Factual R. & Resp. to *Brown v. State*, D.I. 20, at 2-3, 9.
[102] *See id.* at 3.
[103] *Ruiz*, 536 U.S. at 628-33 (citing *Boykin*, 395 U.S. at 243).
[104] *Id.* (emphasis in original).
[105] *Brown*, 108 A.3d at 1206 (quoting *Ruiz*, 536 U.S. at 633).

38

material to Finney at the time he entered his guilty plea. [106] Finney's judicial estoppel argument is likewise rejected on the basis described in detail above.

Finney's postconviction motion is therefore denied on the merits and his request for further discovery and/or retesting will also be denied. There is no assertion that the drugs in his case were not heroin and/or crack cocaine, or that he relied upon an invalid OCME report. Finney pleaded guilty to drug dealing prior to receiving any drug testing report and thereby waived any right to challenge the State's evidence.

## IV. CONCLUSION

For the reasons set forth above, the Rule 61 motions filed in these eight cases are hereby denied. With this decision and the previous ones made by the Supreme Court and this Court, the question now is how to handle the hundreds of cases in which identical motions have been filed. After years of trying and offering new theories of relief as previous ones have been denied, the ODS has been unable to successfully argue under any theory that defendants who have pled guilty have a basis to warrant a new trial. As a result, the Court sees no reason why it should not begin issuing orders denying a defendant's Rule 61 petition if the defendant pled guilty and the basis of the petition is the improprieties at the

---

[106] *See Aricidiacono,*125 A.3d at 679.

OCME. The Court does not believe an individual review of the facts of each of these cases is necessary or warranted under the case law as it presently stands.

After these orders are issued, the Court will decide how to handle the remaining matters which should only be defendants who exercised their trial rights. This will allow the Court and the parties to get relief from the mass filings made by the ODS and allow everyone to focus on cases where the claims may factually warrant further review.

**IT IS SO ORDERED.**

Judge William C. Carpenter, Jr.